IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT
OF PENNSYLVANIA

In Re: RHODIE D. FOWLER,                           :        CHAPTER 13
   Debtor,

LARRY D. FOWLER and
RHODIE D. FOWLER,
   Plaintiffs                            :    BANKR. NO.  07-11692

    v.

GENNARO RAUSO,
DAVID BORSO,
CORY MANESS, and
D AND B PROPERTY INVESTORS CORPORATION,
   Defendants                         :    ADV. NO.  07-139

## PLAINTIFF'S POST-TRIAL MEMORANDUM OF LAW

### A.  INTRODUCTION

   RHODIE D. FOWLER ("the Debtor") filed the individual chapter 13 bankruptcy case

underlying the instant adversary proceeding ("the Proceeding") on March 23, 2007.  Hearings to

consider confirmation of her Chapter 13 plan and a motion of the Chapter 13 Trustee to dismiss

this case have been continued pending the outcome of the Proceeding, most recently until May

26, 2009.  The Proceeding, naming as plaintiffs the Debtor and her husband, LARRY D.

FOWLER ("the Husband;" with the Debtor, "the Plaintiffs"), who has been incarcerated and has

been serving a prison term of five to seven years since August, 2004, was filed on March 30,

2007, and tried on February 23 and 26, 2009.  The delay in conducting the trial, when it was

finally scheduled, arose from a belated change of counsel of one party defendant and an injury to

counsel of another.

   The Proceeding arose from a transaction of December 11, 2006, in which the Debtor,

acting for the Plaintiffs, executed a series of documents which resulted in the transfer of the

Plaintiffs' home at 983 Allengrove Street, Philadelphia, PA. 19124 ("the Home"), to a Trust

entity created by Defendant GENNARO RAUSO ("Rauso"). The transaction was solicited by a

letter sent to the Home by Rauso's agent, followed by telephone contacts between the Debtor and

Rauso and his agents at the Home, and the execution of the documents in the transaction

occurred in the Home. The transaction was described to the Debtor, who is not an individual

who was or is sophisticated about real estate transactions, as a means of "saving" the Home from

foreclosure by temporarily transferring it to a Rauso entity, which would ultimately transfer the

Home back to the Plaintiffs.  The Home was worth approximately $250,000 at the time of the

transaction and it was encumbered by a mortgage with a balance of less than $150,000.  The

Debtor did not receive any copies of the documents prior to the transaction, Rauso admittedly did

not explain them to her at the time of the transaction, and she received only some of the

documents executed, by mail, several days after the transaction occurred.  The documents

memorializing the transaction, all of which were created by Rauso and are prolix, featuring the

establishment of a land trust to which the Home was deeded.  The documents were notarized by

a Delaware County notary and recited that they were signed in Delaware County by the

Plaintiffs, who allegedly both appeared before the notary.  Rauso produced copies of the Land

Trust Agreement ("the LTA") and the Warranty Deed to Trustee ("the Deed") in which a

handwritten insert referencing the Husband's appearance by his power of attorney, the Debtor.

The copies supplied to the Debtor after the transaction occurred contained no such reference, by

instead inaccurately recited that the Husband appeared before the notary.

        As discussed at pages 10-12 infra, the validity of the notarization is a legal issue raised by

the Plaintiffs, and which "version" of the LTA and Deed are legitimate is an important factual

questions in resolving that issue.  The Plaintiffs believe that that the handwritten references to the

2

Debtor's signing as the Husband's power of attorney on the LTA and Deed were clearly affixed after the transaction occurred by Rauso in an attempt to "fix" what Rauso perceived as otherwise defective notarizations. The Debtor's copies of these documents contain no evidence of "whiting out" the handwritten inserts, which is Rauso's explanation for the discrepancy, and it is extremely unlikely that the Debtor would have had any inclination to do so, as there is no evidence that she herself perceived any defect in the notarizations or that she had any knowledge that a different "version" of the notarization would be significant. Rauso, meanwhile, came to understand that the notarizations without the inserts were invalid as they appeared on the Debtor's copies, as attached to the Complaint, and he therefore had a motivation to alter the notarizations. The Plaintiffs therefore request that this court find that the inserts were not included when the documents were notarized and that the affixation of the inserts were (dishonestly) made by Rauso to attempt to "fix" this perceived problem. The Plaintiffs also request this court to hold that such tampering with documents is indicative of the dishonesty which pervaded this transaction. The Plaintiffs submit that this transaction was structured and effectuated by Rauso as an instrumentality to permanently strip and obtain monetary benefit on his part from the Plaintiffs' Home equity, with no intention to restore title to the Home in the Plaintiffs. Since permanent retention of the Home was critical to the Debtor's motivation for entering into the transaction, as known by Rauso, the entire transaction is properly viewed as a fraudulent scheme of Rauso to convert the Plaintiffs' Home equity to his own benefit.

The Plaintiffs both directed letters to Rauso in which they expressed their desire to Rauso to cancel or rescind the transaction within a month from the date of the transaction. At the time that they did so, Rauso had not yet transferred the Home to anyone and obviously could have avoided the involvement of any third parties in subsequent transactions which occurred regarding

the Home. However, based on Rauso's erroneous belief that the transaction was immutable once the Debtor executed the documents and his perception that he would forfeit his perceived windfall by undoing the transaction, Rauso refused to do so. At this point, Rauso ceased communications with the Plaintiffs and provided them with no insight as to what was to transpire with the Home. As it turns out, he quickly resold it to buyers who re-mortgaged it, and the buyers and mortgagee never perceived the Plaintiffs' status until after their transactions were consummated. It is the Plaintiffs' position that the purchasers of the Home from Rauso, as well as the mortgagee who financed the purchase, had sophistication and resources superior to the Plaintiffs which would have been sufficient to ascertain what was occurring here, and that therefore they were not without fault and hence are "more guilty" than the Plaintiffs and should not benefit at the Plaintiffs' expense. However, this is a closer question that the responsibility and attendant liability of Rauso. Rauso could have informed the Plaintiffs of his plans to immediately resell the Home, and he could have informed the new buyers and their mortgagee of the claims of the Plaintiffs. The Plaintiffs submit that he did not do so for two reasons. First, because it would have adversely affected his ability to make a profit from the transaction. Secondly, he was apparently unaware of the fact that the Plaintiffs had a valid right to rescind this transaction under the precepts of 73 P.S. section 201-7 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("the UTPCPL"). As a result, he took the risk that they had no such right. The Plaintiffs argue herein that since he took this risk and must lose, as the Plaintiffs correctly asserted their rights to cancel or rescind the transaction, he must therefore pay the penalty for his wrongful actions. Ironically, Rauso is thus hoisted on his own petard, the theory that "ignorance of the law is no defense," which he articulated as justification for his not explaining the effect and meaning of any of the demands to the unsophisticated Debtor about

legal effect of the mass of confusing and ambiguous documents which he instructed her to execute. The Plaintiffs submit that, if there is any equitable rights that the "innocent" purchasers and mortgagees have, they should be compelled to look to the wrongdoer-Rauso and not to the victim-Plaintiffs for their recourse, especially given the fact that their own culpability and justifications under the law exceeded that of the Plaintiffs.

Before discussing the applicable law, the Plaintiffs must briefly discuss the pleadings filed in the Proceeding and the main bankruptcy case and how they impact upon the rights of the respective parties. The Complaint sets forth four Counts which are in support of the invalidation of the Deed by which Rauso and those claiming under him assert their rights to the Home. The First Count, the simplest and the strongest, is based on the Plaintiffs' statutory, absolute right to cancel this in-home transaction under Section 201-7 of the UTPCPL. The Second is factually based upon the invalid notarization of the Deed and is legally based upon 11 U.S.C. section 544(a) and 21 P.S. sections 444 and 621. The Third is based upon the Plaintiffs' rights due to the terms of the LTA and the lack of the Husband's agreement, and candidly appears to be the weakest. The Fourth is based on the fraud of Rauso under the UTPCPL.

Defendants DAVID BORSO and CORY MANESS ("B & M") filed no pleadings. Defendant Rauso and D AND B PROPERTY INVESTORS CORPORATIION ("D & B") filed only an Answer, without any Affirmative Defenses. This pleading was never amended, even after Rauso changed counsel. An entity designating itself as MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC, AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC., A SUBSIDIARY OF COUNTRYWIDE FINANCIAL CORPORATION ("Countrywide") successfully moved to intervene as a defendant and filed an Answer with Affirmative Defenses. However, it filed no Counterclaims seeking any relief against the Plaintiffs, although it has

presented arguments which the Plaintiffs submit have vitality only if they had been so pleaded.

Also, none of the parties defendant have filed any claims against the Debtor in her bankruptcy

case, despite their knowledge of this bankruptcy case long prior to the bar date of September 18,

2007, and the fact that the bar date has long since passed.   While this court might be inclined to

state that the pleadings in the Proceeding are "informal" claims against the Debtor and that the

failure to file claims in the Debtor's case would not bar claims against the non-debtor Husband,

both of the responsive pleadings filed in the Proceeding, while stating defenses to the Plaintiffs'

claim, fail to state affirmative claims against the Plaintiffs.  The Plaintiffs submit that, as a result

of these limited pleadings, none of the defendants are entitled to any affirmative relief against the

Plaintiffs, including the sort of equitable relief and remedies to which Countrywide expressed its

right in the Trial Brief ("the Brief") which it submitted in the course of the trial of the

Proceeding.

## B. THE PLAINTIFFS ARE ENTITLED TO ENFORCE THEIR RIGHTS TO CANCEL THIS TRANSACTION UNDER THE TERMS OF SECTION 201-7 OF THE UTPCPL

In the First Count of the Complaint, the Plaintiffs assert their right to enforce their

cancellation or rescission of this transaction under 73 P.S. section 201-7 of the UTPCPL.  There

is no apparent dispute that no requisite section 201-7 Notice of Cancellation form was given to

the Plaintiffs.  Therefore, their exercise of their right to cancel or rescind and the re-assertion of

these rights in their filing of this Complaint was timely.  See 73 P.S. section 201-7(e)

(cancellation period does not begin to run until the Notice is provided).  There should be no

dispute that this statutory provision applies to real estate transactions.  See In re Smith, 866 F.2d

576, 581 (3d Cir. 1989).  There should also be no dispute that, since the transaction took place as

a result of what can only be described as solicitations for his services by Rauso on the Debtor's home telephone, and since the documents relating to the transaction were all signed in the Home itself, the transaction occurred "as a result of, or in connection with, a contact with or call on the buyer or resident at his residence either in person or by telephone,..." 73 P.S. 201-7(a). The Plaintiffs also note, as this court observed at trial, that, although the Plaintiffs were the "sellers" of the Home in the transaction, they were "buyers" of the services advertised by Rauso in his agent's solicitation letter of November 2, 2006, promising them, although faced with mortgage foreclosure, that they could stay in the Home and "to buy back the property from us at a later date."

None of the Defendants have articulated any basis on which these claims should not prevail. Neither of the Answers articulates any real defense to this claim, and the application of this law is not among the "Legal Issues Presented" in the Pretrial Statement of Countrywide. It appears clear that Section 201-7 applies broadly to any "services...sold or contracted to be sold to a buyer, as a result of, or in connection with, a contact with or call on the buyer ...at his residence..." See Burke v. Yingling, 446 Pa. Super. 16, 666 A.2d 288 (1995). While reported cases concerning the application of this law to attempts to rescind real estate transactions is sparce, this theory has survived summary judgment motions in several federal rescission actions initiated by the Plaintiffs' counsel, e.g., St. Hill v. Tribeca Lending Corp., C.A. No. 07-5300 (E.D. Pa.); and Devine v. America's Wholesale Lender, C.A. No. 07-3272 (E.D. Pa.), and the Plaintiffs note that this court denied a motion for summary judgment in a case in which a home mortgage transaction was alleged to be within the scope of section 201-7 even though the settlement took place outside the home, because the broker had initially solicited the borrower for the loan at her home, in In re Brown, Brown v. Option One Mortgage Corp., Bankr. No. 04-

35953, Adv. No. 05-169 (Bankr. E.D. Pa. June 30, 2006). However, here, unlike in <u>Brown</u>, the settlement, as well as the solicitations for the services at issue, took place in the Home. Moreover, the settlement occurred in the Home because it was so arranged by Rauso, not as the result of any request by the Debtor or for any social reason. There was no long-term relationship between the parties which caused the Plaintiff to reach out to Rauso. The relationship between the Plaintiffs and Rauso was strictly a business relationship which involved this transaction alone. There is therefore no basis to deny the Plaintiff's 201-7 UTPCPL.

The Plaintiffs emphasize that the right to cancel set forth in Section 201-7 is statutory, and therefore is not dependent on any findings of fraud or over-reaching on the part of Rauso, although certainly there is no absence of these elements in this transaction, as noted at pages 13-17 <u>infra.</u> Because the Plaintiffs clearly articulated a desire to cancel or rescind this transaction, Rauso was obliged, by reason of Section 201-7(g), no later than 20 days after the rescission requests in late December and January, and certainly after the receipt of this Complaint in April, 2007, to honor these notices of cancellation of this transaction by refunding all payments made, returning title to the Home to the Plaintiffs, and canceling the LTA and Deed, as well as the Mortgage and all other documents executed by the Plaintiffs in connection with this transaction. As a result of their failure to do so, Rauso and his entities forfeited any right to the proceeds of this transaction. 73 P.S. § 201-7(i).

The UTPCPL does not address the rights which assigns of a party who has refused to comply with his duties under Section 201-7 might have. However, the federal Truth-in-Lending Act ("the TILA"), which provides for a comparable right of rescission in certain transactions, makes it clear that an attempt of a lender to assign a contract will not cut off the right of the borrowers to rescind. Therefore, 15 U.S.C. section 1635(c) of the TILA provides that "[a]ny

consumer who has the right to rescind a transaction under section 125 may rescind the transaction as against any assignee of the obligation." Thus, the comparable statutory TILA rescission right and remedies therefore cannot be cut off by any assignment of the obligee's rights arising from the transaction. As a result, the Plaintiffs submit that all of the assigns of Rauso, both D & M and Countrywide, should be held to have no rights whatsoever against the Plaintiffs, even had they so pleaded. Consequently, at the point that Rauso failed to comply with his responsibilities under Section 201-7, he should be found to have statutorily lost all of the rights in the Home which he received from this transaction, and the power to validly transfer the Home to any other parties. At that point, he was comparable to a thief of the Home. He therefore could not pass a legal title to the Home to anyone, comparably to a party who obtains title to real estate by engaging in forgery or some other totally fabricated transaction.

Rauso is also liable to the Plaintiffs for up to three times their actual damages arising from the violations of these statutory provisions or at least $100, plus reasonable attorneys' fees under 73 P.S. § 201-9.2(a). Ironically, if this court finds, as the Plaintiffs submit that it must, that the Plaintiffs are entitled to a recovery of the Home free from any potential claims of D & M or Countrywide, they would have no damages, and their recovery against Rauso would be limited to $100 plus recovery of their reasonable attorneys' fees incurred in prosecuting this transaction. The Plaintiffs alternatively will subsequently argue that, if they are found in any way liable to D & M or Countrywide, Rauso, as the principal wrongdoer in this transaction, would be liable to either these parties directly or primarily liable in lieu of the Plaintiffs.

## C. ALTERNATIVELY, THE PLAINTIFFS ARE ENTITLED TO AVOID THIS TRANSACTION UNDER 11 U.S.C. SECTION 544(a), DUE TO THE INVALID NOTARIZATION OF THE DEED

The facts which were developed at trial regarding the notarization of several of the relevant documents, including the Deed of the Home to the Trust, particularly the surprising presentation of Exhibits R-12 and R-13 with a different notarization page than Exhibits P-2 and P-3, which were attached to the Complaint and had never attracted any comment heretofore, gave support to the Count Two claims that the LTA and Deed, particularly the latter, were invalidly notarized and therefore subject to attack under 11 U.S.C. section 544(a) of the Bankruptcy Code.

The aforementioned section of the Bankruptcy Code permits a trustee in bankruptcy to avoid any transfer of property which is voidable by a creditor who would have extended credit at the time of the commencement of the case and could have obtained a judicial lien on the property transferred or executed on that property or who could have been a good faith purchaser from the debtor at that time. The pertinent Pennsylvania statute, 21 P.S. section 444, provides that "[a]ll deeds and conveyances...shall be acknowledged by the grantor, or grantors. before...[a] notary public of the county wherein the said lands lie...and which shall not be proved ...as aforesaid, shall be adjudged fraudulent and void against any subsequent purchaser or mortgagor for a valid consideration, or any creditor of the grantor..." As the bankruptcy trustee stands in the shoes of an "ideal" creditor or bona fide purchaser, a conveyance which is not properly acknowledged is subject to avoidance by the trustee. Moreover, if the transfer is voidable by the trustee under section 544 of the Code and the trustee does not attempt to avoid the transfer, the debtor may do so if the debtor could have exempted the property, the transfer is not "voluntary," and the debtor did not conceal the property. 11 U.S.C. sections 522(h) and (g)(1).

The instant transfer of the Home was accomplished through an improperly-notarized LTA and Deed. The notary public at issue was "of" Delaware County, not Philadelphia County, the place where the "lands lie;" the notary improperly recited that the LTA and Deed were executed in Delaware County; and the notary improperly recited that the Husband appeared before him, when he clearly did not. Although the first two defects are undisputed, the last defect is dependent on a factual finding that the notarizations accompanying the LTA and the Deed which were notarized were those containing the erroneous declaration that "personally appeared Larry D. Fowler" as are attached to Exhibits P-2 and P-3 rather than the notarization attached to Exhibits R-12 and R-13. However, it is submitted that this factual finding should be quite easy to make. The notarizations attached to P-2 and P-3 are identical to those of the other documents notarized in connection with the transaction, including R-8 and R-17. It is clear that, unlike Rauso, the Debtor would have neither the inclination nor the acumen to undertake to alter only the notarizations of the critical documents, namely the LTA and the Deed. It should also be recalled that Rauso admitted in his deposition (R-16, at pg. 40, ll. 17-18) that the "acknowledgement isn't completely proper...."

What Rauso apparently did not know is that, under the legal principles developed in In re Fisher, 320 B.R. 52, 64-69 (E.D. Pa. 2005), the error in the notarizations is critical to the determination of the validity of a document in bankruptcy, where the trustee and the debtor, in his stead, under 11 U.S.C. sections 522(h)(1) and (g), attack the validity of a document by challenging the validity of the notarizations. Accord, In re Rice, 133 B.R. 722, 725-28 (Bankr. E.D. Pa. 1991). After Rauso's refusal to honor the Plaintiffs' rescission, the transfer of the Home in the transaction in issue could hardly be classified as anything but "involuntary," in contrast to the transaction at issue in In re Funches, 381 B.R. at 490, 493-95 (Bankr. E.D. Pa.

2008), wherein this court questioned whether the requirements of these Code sections had been

satisfied. Therefore, the Plaintiffs are justified in stepping into the shoes of the trustee and

attacking this transaction in the capacity of an ideal lien creditor or bona fide purchaser. Since

they are empowered to avoid this transfer, the Plaintiffs have stated a viable alternative basis for

the relief of avoidance of the transfer of the Deed in this transaction to Rauso in Count Two of

the Complaint.

## D. THE HUSBAND'S STATUS AND THE PROVISIONS OF THE DOCUMENTS THEMSELVES MAY HAVE ESTABLISHED ALTERNATIVE GROUNDS FOR INVALIDATING RAUSO'S DEED

In Count Three, the Plaintiffs asserted two alternative bases for avoidance of the transfer

of the Home to Rauso. The first notes that the Husband never agreed to the terms of the

transaction and therefore he challenged the entire transaction, at least as to him. The second

relates to that provision in the LTA, paragraph 22, which grants the Beneficiary, therein

identified as the Plaintiffs, the right to terminate the Trust in writing "thirty (30) days or more

after the date upon which the Beneficiary agrees in writing to said termination." The Plaintiffs,

and specifically the Husband, each sent writings to Rauso seeking termination of the parties'

entire transaction. Therefore, it would seem that, under the terms of the LTA, it was terminated.

The responses of Rauso to these contentions are that they are overcome by other documents in

the confusing mass of documents signed by the Debtor, copies of only some of which were

provided to her. The presence of the Debtor's power of attorney to act for the Husband is said to

overcome the Husband's claim. The Assignment of Beneficial Interest in Land Trust is said to

have wiped out all of the Plaintiffs' beneficial interest which they "acquired" in the LTA signed

almost simultaneously therewith. The response to these arguments of Rauso is that the

documents which memorialize the transaction are so ambiguous, confusing, and internally

inconsistent that, since their meaning must be construed against Rauso as the party presenting them, if not their draftsperson, they may well be construed to provide the Plaintiffs with a right to terminate this transaction.  If so, these assertions by the Plaintiffs may be determined to be alternative bases on which to declare that the transaction was validly terminated by the Plaintiffs.

## E. THE PLAINTIFFS HAVE SUFFICIENTLY ESTABLISHED CLAIMS AGAINST RAUSO  PURSUANT TO SECTION 201-2(4) OF THE UTPCPL

The Fourth Count of the Complaint asserts claims that Rauso's actions in the course of this transaction violated 73 P.S. section 201-2(4)(v),(ix), (xv), and (xxi) of the UTPCPL, and therefore a rescission of the transaction of December 11, 2006, is warranted.  In assessing these claims, it is important to analyze what Rauso promised he would do for the Plaintiffs and compare it to what he did.  The fundamental purpose for which the Plaintiffs entered into the transaction was to save the Home from its loss by them. This, Rauso knew.  His solicitation letter was aimed at providing services to the Plaintiffs which would save the Home from loss in a foreclosure proceeding.  Clearly, the Plaintiffs did not hire Rauso to save the Home from foreclosure by means of his taking it for himself.

Rauso concedes that his solicitation to the Plaintiffs, while it contemplated a temporary transfer in some manner to him or his entities, also promised a clear opportunity for them, given their circumstances, to retain the Home.  Thus, perhaps the most material term was the opportunity of the Plaintiffs to re-acquire the Home from Rauso.  Moreover, the Debtor made clear her financial inability to initially pay rent of $1000/month to Rauso and she admittedly received repeated assurances from him that he would provide her with reasonable dispensations in making these payments.

Although, like all of the terms of the transaction, these terms were not clearly explained to

the Debtor, the right of the Plaintiffs to repurchase the Home was provided in paragraph 4 of the

LTA, wherein it is stated that "The Trustee shall give [the Plaintiffs] the first right to re-purchase

the Trust property only if [the Debtor] complies with all of the terms of the lease

agreement….Said right to re-purchase the property will be rendered void and of no legally

binding effect the day said lease is breached…." Rauso apparently agrees that this "right to re-

purchase" survived the Assignment of Beneficial Interest in Land Trust executed by the

Plaintiffs. He further stated, however, that, when the Plaintiffs expressed their desire to cancel

the transaction, he considered that action to be an expression of an intention of the Plaintiffs to

violate the lease agreement. He also stated that the Plaintiffs' failure to pay rent in December,

2006, and January, 2007, constituted a breach of the lease agreement, apparently believing that

the Plaintiffs' expressed intention to cancel constituted     action which justified his retraction of

his promise to provide payment dispensations to the Debtor. It should also be noted, however,

that when he came around to filing a landlord-tenant complaint against the Plaintiffs (P-10),

Rauso stated that only February and March, 2007, rentals were due.

Rauso did not claim that he provided any oral notice nor did he produce any writing sent

to the Plaintiffs in which he explained his intention to declare a violation of paragraph 4 of the

LTA and rescind his promise of rent-payment dispensations to the Debtor. Nor did he indicate

that he give any other notice of his intentions. Since Rauso was unilaterally declaring the most

significant aspect of the transaction to the Plaintiffs, their right to retain the title to the Home

void, it   to reason that she should have expressed that decision of his to the Plaintiffs in some

way before taking any actions. However, by January 20, 2007, about one month after the

documents representing the instant transaction were signed, Rauso signed an Agreement of Sale

of the Home to B & M, misrepresenting to them that the only residents of the Home were tenants who would vacate the Home by the settlement date of February 15, 2007. Rauso justifies these actions by his erroneous assumption that the Plaintiffs' attempt to cancel or rescind the transaction were invalid and by some sort of assumed anticipatory breach of the parties' contract. In addition to being mistaken regarding the law pertinent to the Plaintiffs' right to rescind the transaction, the actions of Rauso indicate a clear intention to make a profit by concealing facts known only to him to parties on both sides of the transaction. Thus, it was strictly for his own benefit that he did not disclose his actions to the Plaintiffs. Also, he did not disclose the nature of his acquisition of the Home or the Plaintiffs' valid expressions of cancellation to D & M. All of this was in furtherance of his profits in the transaction. By means of his obtaining a mortgage on the Home from the Plaintiffs for no consideration, Rauso was able to realize a $45,000 profit, which admittedly has not yet been offset by this payments to D & M towards the Countrywide mortgage and his legal fees incurred in defending against the Plaintiffs' just claims against him.

Reviewing a combination of facts and factors leads to the unmistakable conclusion that Rauso engaged in "unfair and deceptive practices" in the transaction at issue. He solicited the Plaintiffs as a provider of help for them in saving their Home. He had the Debtor sign a confusing array of documents which he did not explain to her, believed that he need not explain to her, gave her no copies prior to or even after she signed them and then later provided only in part, among which were documents which served only his benefit (such as a mortgage in favor of his corporation, for which there was no consideration), promised the Debtor dispensations in making payments, unilaterally decided that the Plaintiffs breached their obligations, and then, as quickly as he could, attempt to "launder" the transaction by selling the Home to third parties, omitting material disclosures to parties on both ends regarding his actions. Moreover, he failed

to provide the disclosures of the Plaintiffs' right to cancel this transaction to them and refused to

honor their cancellation rights when they were asserted, even though he had made no

commitments to third parties at the time of the cancellation. The Plaintiffs submit that this

course of conduct constituted "[r]epresenting that …services have…characteristics, [or]

…benefits, …that they do not have;" "[a]dvertising…services with intent not to sell them as

advertised;" [k]nowingly misrepresenting that services…are needed if they are not needed;" and

"[e]ngaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or

of misunderstanding." 73 P.S. section 201-2(4)(v), (ix), (xv), and (xxi).

The Plaintiffs submit that the violations of 73 P.S. sections 201-2(4) (v), (ix), and (xv)

stand apart from the violations of 73 P.S. section 201-2(xxi) and need not be supported with

proof of the elements of common-law fraud, as may be necessary to successfully assert claims

under 201-2(xxi). However, the Plaintiffs also do not shrink from asserting that they have made

out claims under the UTPCPL against Rauso, even assuming arguendo that they must prove all

of the elements of fraud, including justifiable reliance on the fraudulent misrepresentations of

Rauso. See Tran v. Metropolitan Life Ins. Co., 408 F.3d 130, 135-36 (3d Cir. 2005); and Toy v.

Metropolitan Life Ins. Co., 593 Pa. 20, 928 A.2d 186, 201-08 (2007). The Plaintiffs have

established that Rauso misrepresented the terms of the transaction in numerous very material

respects, particularly preserving their right to retain title to the Home. In fact, the disposition of

the Home was so quick that this court would be justified in finding that Rauso never meant to

return title to the Plaintiffs, but rather intended to re-sell the Home at a profit at the earliest

possible moment. Moreover, the record provides proof of not only misrepresentations and

fraudulent or mistaken utterances, but also an intention of Rauso that the Debtor would be

induced to act upon his misrepresentations, justifiable reliance on the misrepresentations by the

Debtor, and damages to the Plaintiffs as a result. See Tran, supra, 408 F.3d at 135 n.8. The

misrepresentations of Rauso, as catalogued above, pervaded the transaction and induced the

Debtor to go through the transaction and then refused to allow the Plaintiffs to exercise their

right of rescission of it. The damages suffered by the Plaintiffs can be ascertained only when the

rights of the other interested parties are set forth by this court.

It is perhaps necessary to emphasize why the Debtor's reliance on Rauso's

misrepresentations was "justified." In some other case scenarios it might be contended that

"justifiable reliance" was lacking when consumers went through with transactions the terms of

which had been previously misrepresented, because they were aware that the contracts at issue

did not contain the terms which they had been previously promised and they still opted to go

through with the transaction. However, here, the documents presented to the Debtor were

ambiguous, confusing, and explanations were admittedly absent. In such a factual setting, it

cannot be said that "justifiable reliance" by the Debtor on representations by Rauso was lacking.

It should also be recalled that in Tran and Toy the respective courts refused to grant summary

judgment on UTPCPL fraud claims in favor of the respective parties charged with making

misrepresentations even though the respective plaintiffs admitted that they had not read the

contracts at issue. Thus, those cases support fraud claims even though the fraud victims failed to

read or digest the documents with which they were presented.

As a result, the Plaintiffs were drawn into a transaction which did not serve their

articulated intention to save their Home. The services provided were not provided as advertised.

The services, as provided, were not what the Plaintiffs needed to save the Home, as Rauso well

knew. The Debtor was clearly subjected to "other fraudulent or deceptive conduct which creates

a likelihood of confusion or of misunderstanding" in her mind. Therefore, Rauso should be

found to have engaged in "unfair and deceptive acts or practices" in this transaction, which

justify the entire panoply of remedies sought by the Plaintiffs under 73 P.S. section 201-2(4) and

the damages and attorneys' fees allowable under 73 P.S. section 201-9.2(a).

## F. COUNTRYWIDE IS NOT ENTITLED TO THE EQUITABLE CLAIMS WHICH IT SEEKS TO ASSERT AGAINST THE PLAINTIFFS

Although it intervened in this action as a defendant, which ordinarily would have been for

the purpose of "assisting" the named defendants in preventing their defenses in order to prevent

prejudice to its interests, Countrywide, in its Pretrial Statement and Brief, has expressed no

intention of joining the co-defendants in their assertion of defenses and has rather assumed that it

is entitled is to assert equitable claims against the Plaintiffs in the event that the Plaintiffs prevail

in rescinding the transaction with Rauso in which the Home was transferred to him or his related

entities. The Plaintiffs re-emphasize that this three claims of Countrywide are inconsistent with

its pleadings and its failure to file a claim against the Debtor in her bankruptcy case. These

assertions by Countrywide are not affirmative defenses or defenses at all. Rather, it appears that

Countrywide has assumed, correctly, that the defense of the Plaintiffs' aforesaid claims against

the other defendants is a lost cause. Thus, at the outset, the Plaintiffs urge that Countrywide has

incorrectly assumed that it has properly pleaded such claims against the Plaintiffs. It has not,

and the Plaintiffs therefore submit that these claims cannot properly be asserted in the

Proceeding. However, in the remainder of this discussion, the Plaintiffs will assume, arguendo,

that Countrywide _had_ filed timely claims against the Debtor and _had_ filed pleadings which

asserted counterclaims against the Plaintiffs.

The Brief states that Countrywide seeks to assert a mortgage against the Home, as well as

a declaration that D & M, and not the Plaintiffs or Rauso, have a valid title to the Home. The

"legal issues" briefed by Countrywide are assertions that (1) it is a bona fide mortgagee of the
Home; (2) rescission is "not available" to the Plaintiffs; and (3) it is entitled to some relief on the
theory of "unjust enrichment" or some other equitable principles.

Insofar as the issue of ownership of the Home, Rauso has no claim of ownership. D & M
have not asserted any claim of ownership. The only parties claiming ownership of the Home are
the Plaintiffs. Countrywide has no right to dictate who the owners of the Home are or should be.
Moreover, this purported statement of what Countrywide seeks with respect to the title of the
Home is fundamentally inconsistent with its subsequent arguments. Unless the Plaintiffs regain
title to the Home, there is no conceivable basis on which they could be liable in any respect to
Countrywide. They have no contract with Countrywide, and there is no equitable basis to
impose one unless it is in conjunction with the restoration of title to the Home in the Plaintiffs.
The Plaintiffs reiterate that they had a statutory right to rescind the December 11, 2006,
transaction with Rauso which they timely exercised. They are entitled to recover title to the
Home. Whatever rights Countrywide claims make sense only in that context.

Countrywide's argument that it is a good faith mortgagee is disputed factually. The
Debtor was at all times in clear and open possession of the Home. The fact that Countrywide's
predecessor in interest, at the height of the rampant proliferation of mortgages which made no
sense and have resulted in an international monetary crisis, operating through brokers whose
only motivation was to do a deal, chose to make this mortgage which never should have been
made and would not have been made if someone had taken the simple responsibility of
determining who was residing in the mortgaged property and under what rights, was not the
Plaintiffs' doing. They knew nothing of what Rauso was doing. The fact that Countrywide
engaged in no apparent oversight in taking an assignment of this mortgage is not the Plaintiffs'

doing, either. Assignees generally take assignments subject to all defenses against their assignors. See Marsh v. Bowen, 335 Pa. 314, 317, 6 A.2d 783, 785 (1939) ("The familiar doctrine that an assignee ...takes all the rights of the assignor and is subject to the equities against him needs no citation of authority."). One lesson hopefully learned by lenders in the wake of the apparent monetary crisis is that oversight in making and accepting assignments of secured loans must be done. The negligence of refusing to do so cannot be justified by "common" business practices that have been proven to be disastrous. The fact is that the Plaintiffs' rights in the Home could have been easily ascertained by the Defendants if the circumstances of residence of the Home had been investigated by D & M, who hoped to turn a quick profit with little concern about who was living in the Home, or the original lender, or by Countrywide. A title search by an attorney who was unable to identify the owner and mortgagee of the secured property should have provided little comfort. The Plaintiffs dispute any assertion by any of the Defendants that they acted reasonably in this matter and that therefore they were proceeding in objective good faith.

The "bona fide purchaser" cases cited by Countrywide should provide it with no comfort. In Long John Silver's, Inc. v. Fiore, 255 Pa. Super. 183, 386 A.2d 569 (1978), the court found that a subsequent lessee was not a good faith purchaser entitled to upset a legitimate agreement of sale. In re Hotel Associates, Inc., 10 B.R. 668 (Bankr. E.D. Pa. 1981), held, similar to the Count Two claim asserted herein, that a bankruptcy trustee was an ideal creditor entitled to avoid an agreement of sale of a hotel condominium. It therefore does not support Countrywide's position in the Proceeding. Countrywide is compelled to resort to a case which is 200 years old, Heister v. Fortner, 2 Binn. 40, 1809 WL 1323 (Pa. 1809), to extract the principle, articulated by but one of the deciding judges, that a defective acknowledgment in a deed was not notice of a

defect to the purchasers at a sheriff's sale. It is most doubtful that the confusing facts of that case
are in any sense analogous to those here.

The next set of cases appear to stand for the principle that rescission is not available to the
Plaintiffs. However, these cases does not address a statutory right of consumers to rescind, as
arises from 73 P.S. section 201-7, or, for that matter, the statutory power of a bankruptcy trustee
to avoid a defective transfer. What should be clear is that the Plaintiffs do have a right to
rescind. Countrywide's legitimate arguments must arise elsewhere. Certainly, Countrywide's
position is not advanced by its citation of Kepler v. Kepler, 330 Pa. 441, 446, 199 A. 198, 203
(1938), wherein the court, reversing the dismissal of an action to set aside a mortgage which was
incurred against a property by a party alleged to have obtained title to the property by fraud,
states as follows: "The rule is that, where a mortgage is given solely as security for an
antecedent debt, and the mother's last agreement was such a mortgage, the mortgagee takes
subject to all equities, including fraud, here the son's misrepresentations. An antecedent debt is
not valuable consideration, and, in the absence of such consideration, a mortgagee or a creditor is
not to be treated as a holder for value without notice." Following this rule, Countrywide took its
mortgage subject to the Plaintiffs' defenses, including a statutory right to rescind the transaction
which improperly took title out of the Plaintiffs.

Countrywide's interests do not or should not arise from the doctrine of "unjust
enrichment." The application of the doctrine is rejected in all of the cases cited by Countrywide
except Schenk v. K.E. David, Ltd., 446 Pa. Super. 94, 666 A.2d 327 (1995), typically with the
admonition that that the doctrine arises only when the party charged "wrongfully secured or
passively received a benefit that it would be unconscionable …to retain." Roman Mosaic & Tile
Co. v. Vollrath, 226 Pa. Super. 215,218, 313 A.2d 305, 307 (1974) (wife not liable for tile

installed in laundromat ordered by her co-owner husband, since she took no action to cause the

tiles to be installed). Similarly, here, the Plaintiffs did nothing to cause Countrywide's

predecessor to advance its mortgage to D & M, as they had no idea that the Home had been sold,

let alone was subjected to a mortgage. The result in Schenk, which involved the quite distinct

factual pattern of a successor attorney attempting to stiff his predecessor for work done to the

client's benefit, was driven by the injustice of the entire scenario. Here, the Plaintiffs did

nothing which was unjust. They were simply victimized by the opportunistic Rauso.

Countrywide also invokes such cases as Stanko v. Males, 390 Pa. 281, 135 A.2d 392

(1957); and Nebesho v. Brown, 8346 A.2d 721 (Pa. Super. 2004). In those cases, the parties

who obtained restitution from owners asserted claims for same. It also appears that in each case

the owners were aware that payments were being made on their behalf and they knowingly

accepted same. Here, the Plaintiffs had no inkling of the involvement of Countrywide or its

predecessor until after the Proceeding was commenced. Countrywide's attempt to apply these

cases improperly seeks to stretch the concept that an owner should be liable for a necessary

expense such as taxes paid, as was at issue in those cases, to extend to a large mortgage which

was far in excess of what the Plaintiffs ever placed against the Home, wiping out their equity and

creating an obligation beyond their financial ability to pay.

Countrywide ends by citing two more "unjust enrichment" cases, Gladowski v. Felczak,

346 Pa. 660, 31 A.2d 718 (1943); and General Casmir Pulaski Building & Loan Ass'n. v.

Provident Trust Co., 338 Pa. 198, 12 A.2d 336 (1940). The facts of those cases are

distinguishable from the instant facts because, in both cases, the parties found to ultimately be

the owners of the properties at issue were well aware of the mortgages and expenditures on their

properties by the parties claiming ownership. Again, here, the presence of Countrywide and its

predecessor were unknown and basically unknowable to the Plaintiffs at the time that the financial commitments were made.

The sum total of these cases is that none of them support the relief requested by Countrywide on comparable facts. It is only by a stretch of the facts that the conclusion can be drawn that Countrywide benefited the Plaintiffs. It is true that the Plaintiffs, the prior mortgage on the Home was liquidated by the proceeds from the Countrywide loan. However, it was on terms to which the Plaintiffs never would have agreed, including the imposition of a mortgage bloated by the profits realized by Rauso from this transaction.

Equitable considerations would dictate that Rauso, who conceived and perpetuated the fraud on the Plaintiffs and illegally refused to honor the rescission which would have avoided the later involvement of D & M and Countrywide, should be the only party liable to Countrywide in this scenario. Therefore, Countrywide's relief should be confined to him. While it might be argued that Countrywide has not made a claim against Rauso in the Proceeding, the Plaintiffs again observe that Countrywide has not made a claim against them in the Proceeding either. Countrywide is not barred from seeking relief from him in the future in some other appropriate form. Ironically, Rauso seems to have sensed that his payment of the obligation to Countrywide was an equitable resolution by his payment of the D & M mortgage to Countrywide through December, 2008. His testimony revealed that the only effect of these payments on his financial balance sheet from the transaction thus far was to wipe out most of his windfall profits. It would certainly not be unjust to cause Rauso to suffer a loss from this transaction, in light of the fact that his actions and inactions perpetuated the damages suffered by all of the other parties involved.

If this court somehow finds its way to grant any sort of relief to Countrywide against the

Plaintiffs, which it is submitted would require it to leap the tall buildings of providing relief not

properly requested in the pleadings, total lack of precedent, and a sympathy for one of the largest

predators of predatory loans whose business practices, including maintaining a distance from the

parties to its loans which caused it to make loans and which no rational and informed lender

would ever make, was a strong contributing factor to its participation in this loan, then Rauso

should be liable to the Plaintiffs for same as an element of their "actual damages" caused by his

fraud and violations of 73 P.S. section 201-7.  That result would be consistent with the pleadings,

precedent, and any sort of sympathy properly accorded to a desperate homeowner whose plight

was played upon and who was led astray by a party much more knowledgeable, whom she

unwisely trusted.  The UTPCPL was, after all, conceived as a remedy for the unwise who are led

astray by the more knowledgeable, as occurred in the instant transaction.

## F. CONCLUSION

This court should enter an order which enforces the Plaintiffs' right to cancel this

transaction, restores title to the Home in the Plaintiffs, and awards the Plaintiffs their reasonable

attorneys' fees from Rauso.  Any other relief would exceed what has been requested in the

pleadings in the Proceeding.

DAVID A. SCHOLL
6 St. Albans Avenue
Newtown Square, PA.  19073
610-353-7543
Attorney for Plaintiffs