### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 13 |
| | : | |
| **RHODIE D. FOWLER,** | : | |
| | : | |
| Debtor(s) | : | Bky. No. 07-11692ELF |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |
| | : | |
| **LARRY D. FOWLER, et al.,** | : | |
| | : | |
| Plaintiff(s) | : | |
| | : | |
| v. | : | |
| | : | Adv. No. 07-00139ELF |
| **GENNARO RAUSO, et al.,** | : | |
| | : | |
| Defendant(s) | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |

# O P I N I O N

## TABLE OF CONTENTS

**I. INTRODUCTION**

**II. PROCEDURAL HISTORY**

**III. FINDINGS OF FACT**

**IV. CONCLUSIONS OF LAW**

    **A. LIABILITY:  Violation of Section 201-7 of the UTPCPL**

        **1. The Statute:  Section 201-7 of Pennsylvania's Consumer Protection Law, the Right to Cancel Certain Transactions and the Enforcement of the Right to Cancel**

        **2. Section 201-7 Applies to the December 11th Transaction Between the**

Plaintiffs and Rauso

    **a.  the Plaintiffs were the buyers in the sales transaction Rauso devised**

    **b.  the $25.00 statutory threshold is satisfied**

    **c.   the "gist of the action" doctrine does not bar the Plaintiffs' claim**

    **d.   summary**

**3.   Rauso Violated Section 201-7**

**4.   Rauso's Violation of Section 201-7 of the UTPCPL Entitles the Plaintiffs to Remedies Under Section 201-9.2**

**B.  REMEDIES**

    **1.   Restored Title to the Allengrove Property**

        **a.   void ab initio v. voidable title**

        **b.   Pennsylvania Law on Bona Fide Purchasers for Value Without Notice**

        **c.   The Downstream Title Defendants' Notice of the Plaintiffs' Unrecorded, Equitable Claim to Ownership of the Allengrove Property**

            **(1) The Debtor's Status As A Former Record Titleholder Does Not Discharge the Downstream Title Defendants' Duty of Inquiry**

            **(2) Other Considerations**

        **d.   The Downstream Title Defendants Are Not Bona Fide Purchasers**

    **2.   Countrywide Is Entitled to An Equitable Lien**

        **a.   the court's power to impose an equitable lien under Pennsylvania law**

        **b.   legal standards for imposition of equitable lien in Pennsylvania**

> **c.  balancing the equities in this case**
>
> **d.  the extent of the Countrywide's equitable lien**
>
> **3.  Actual Damages, Treble Damages, Attorney's Fees and Costs**

## V.  CONCLUSION

## I.  INTRODUCTION

In November 2006, Defendant Gennaro Rauso ("Rauso") sent a letter to Debtor Rhodie Fowler ("the Debtor") offering to help her stop the impending foreclosure and loss of her home. Already distressed by the loss of her job and income, as well as by her husband's incarceration, the Debtor responded to the letter.  Thereafter, a series of telephone calls from Rauso to the Debtor ensued, culminating in Rauso's visit to the Debtor's home on December 11, 2006. During that visit, Rauso orchestrated a transaction ("the December 11th Transaction") pursuant to which the Debtor, acting on behalf of herself and her husband (collectively, "the Plaintiffs"), inter alia:

> (a) transferred, for no consideration, title to the Plaintiffs' home to Rauso as "trustee;"
>
> (b) agreed to pay Rauso an hourly fee for services he promised to provide for them in the future;
>
> (c) granted a $60,000.00 mortgage on the Plaintiffs' home to a company Rauso controlled, D&B Property Investors Corporation ("D&B"), and
>
> (d) agreed to lease the Plaintiffs' home from Rauso, with an option to repurchase it in one (1) year.

Shortly after completing the December 11th Transaction with Rauso, the Debtor and her

husband concluded that it was not in their best interests and informed Rauso that they wanted to

rescind it.  Asserting he had no legal obligation to rescind, Rauso refused to cancel and instead,

in January 2007, arranged to sell the Plaintiffs' home to two (2) third parties (Defendants David

Borso and Corey Maness).  Settlement on the sale to Borso and Maness occurred in February

2007.  Financing for the sale was provided, in part, through a mortgage loan currently held or

serviced by Countrywide Home Loans, Inc. ("Countrywide").  The Plaintiffs received no notice

of the sale and no share of the net proceeds.  Further, in March 2007, Rauso filed a landlord-

tenant complaint on behalf of Borso and Maness seeking to evict the Debtor from the property.

Shortly afterwards, the Debtor filed a chapter 13 bankruptcy case and, joined by her non-debtor

husband, commenced this adversary proceeding.

In this adversary proceeding, the Plaintiffs seek to invalidate the December 11th

Transaction and restore their ownership of the subject property and invalidate both Borso and

Maness' title and Countrywide's mortgage lien.  The Plaintiffs assert that they are entitled to this

relief under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("the

UTPCPL") and 11 U.S.C. §§ 544 and 522(h) and (g)(1).  They also seek an award of actual and

treble damages and attorneys' fees and costs from Rauso.

In response, Rauso denies liability.  Borso, Maness and Countrywide all claim to be bona

fide purchasers for value entitled to retain their respective interests in the subject property

notwithstanding the Plaintiffs' claims against Rauso.

Trial of this adversary proceeding was held on February 20 and 23, 2009.[1]

---

[1]      The bankruptcy court has jurisdiction in this proceeding under 28 U.S.C. §1334(b)
because the proceeding is "related to" the bankruptcy case.  Specifically, the terms and
confirmability of the Debtor's proposed chapter 13 plan are dependent upon the outcome of this

(continued...)

For the reasons that follow, I find that:

1. Rauso violated the UTPCPL;

2. the Plaintiffs are entitled to rescind the December 11th Transaction with Rauso and set aside the transfer of title to their home to Rauso as "trustee;"

3. Maness, Borso and Countrywide do not qualify for the protections accorded bona fide purchasers for value;

4. the Plaintiffs are entitled to have their title to the property restored;

5. Countrywide is entitled to an equitable lien in an amount equal to the enhancements it made to the value of the Plaintiffs' property by paying off the Plaintiffs' mortgage and certain other liens;

6. the Plaintiffs are not entitled to recover actual damages because the return of title to their property will adequately address the Plaintiffs' financial harm;

7. the Plaintiffs are entitled to recover  attorneys' fees and costs from Rauso.

I will enter an order providing for the relief described above and scheduling a status

hearing to obtain further guidance from the parties with respect to certain unresolved details

concerning the contours of Countrywide's equitable lien.

## II.  PROCEDURAL HISTORY

On March 23, 2007, the Debtor filed a voluntary petition under chapter 13 of the

---

[1](...continued)
adversary proceeding.  Because all of the parties have consented to the entry of a final judgment by the bankruptcy court, (2 N.T. at 150), the court will do so, rather than enter proposed findings of fact and conclusions of law.  See 28 U.S.C. §157(c)(1); In re Allegheny Health Educ. & Research Found., 383 F.3d 169, 175-76 (3d Cir. 2004).

Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania,

Bky. No. 07-11692ELF.  (Bky. Docket Entry No. 1).

On March 30, 2007, the Debtor and her husband filed a Complaint commencing this

adversary proceeding.  (Adv. Docket No. 1).  Initially, the named defendants were Rauso, D&B,

Borso and Maness.  Rauso and D&B filed an Answer to the Complaint.  (Adv. Docket No. 9).

Borso and Maness did not file a response to the Complaint.  At no point, however, did the

Plaintiffs seek a default judgment against Borso & Maness; further, Borso and Maness

participated, pro se, in the pretrial hearings and conferences in the adversary proceeding.

By Order dated July 30, 2007, the court approved a stipulation that authorized

Countrywide to intervene as a defendant.[2]  (Adv. Docket No. 13).  On August 1, 2007,

---

[2]    The Plaintiffs did not name Countrywide as a defendant in their Complaint.
Approximately four (4) months after the Plaintiffs commenced the adversary, by stipulation of the parties,
Mortgage Electronic Registration Systems, Inc. ("MERS"), in its capacity as "nominee for Countrywide
Home Loans, Inc," intervened as a party defendant in this adversary proceeding.  (See Adv. Docket Entry
Nos. 12, 13).

        The record is unclear regarding the nature of the respective interests of MERS and
Countrywide.

        The Intervention Stipulation filed by the parties (Adv. Docket Entry Nos. 12) refers to
MERS as "the holder" of the mortgage on the subject property "as nominee for Countrywide," thus
suggesting that Countrywide holds the beneficial interest in the mortgage.  Accord, In re Mitchell, 2009
WL 1044368, at *1 (Bankr. D. Nev. Mar. 31, 2009) ("MERS is a national electronic registration and
tracking system that tracks the beneficial ownership interests and servicing rights in mortgage loans,"
designed to eliminate the need to prepare and record assignments when trading residential and
commercial mortgage loans).

        The parties' Pretrial Statement, however, states that Countrywide obtained an assignment
of the "servicing rights" of the subject mortgage through an instrument that was "recorded with the
Philadelphia Department of Records."  To further confuse things, the Pretrial Statement also suggests

that Countrywide is not just the servicer, but rather is the holder of the mortgage, by repeating the
statement made in the Intervention Stipulation that the mortgage is "currently held by [MERS] as
nominee for Countrywide." (Compare MERS' Pretrial Statement ¶¶27-29 (Adv. Docket Entry No. 39)

(continued...)

Countrywide filed an Answer and Affirmative Defenses to the Complaint.  (Adv. Docket No.

14).

Trial of this adversary proceeding was held on February 20 and 23, 2009.[3]  Six (6)

witnesses testified at the trial.[4]  The parties filed post-trial submissions, the last of which was

filed on May 4, 2009.

---

[2](...continued)

<u>with</u> Plaintiffs' Pretrial Statement Part II (Adv. Docket Entry No. 41) (acknowledging that facts set forth in ¶¶27-29 of MERS' Pretrial Statement are uncontested).

At trial, still another description was provided. A Countrywide representative testified that Countrywide bought the mortgage from Money Warehouse, then bundled it together with mortgages and sold it to Bank of New York, ("BONY"), while retaining the servicing rights.

I consider it most likely that the trial testimony accurately portrays Countrywide's present interest in the subject mortgage.  More to the point, it appears that the parties implicitly agree that MERS is nothing more than a straw party with no beneficial interest in the mortgage, that Countrywide's servicing agreement with BONY grants Countrywide the authority to act on BONY'S behalf in this litigation and that Countrywide (and ultimately BONY) will be bound by MERS' intervention in this adversary proceeding.  I will not disturb the parties' apparent agreement on this issue.

Finally, I note that in its Pretrial Statement and Trial Brief, MERS, the record intervenor-defendant, refers to itself as "Countrywide." In this Opinion, I will follow the same convention.

[3]    In this Opinion, I will cite the notes of testimony from February 20, 2009 as "1 N.T." and the notes of testimony from February 23, 2009 as "2 N.T."

[4]    Those witnesses were the Debtor, Rauso, James Chapis (the notary for the December 11th Transaction between Rauso and the Plaintiffs), Cathy McNutt (manager of a group of litigation liaisons for Countrywide), John DiGiacomo (title agent for Borso, Maness and Countrywide) and Maness.

## III.  FINDINGS OF FACT

After consideration of the testimony presented at trial, the documentary evidence, the

pleadings, the parties' submission of stipulated facts and their post-trial submissions, and based

upon my assessment of the credibility of the testifying witnesses,[5] I make the following findings

of fact:

### A.  The Plaintiffs' Backgrounds

1.    The Debtor is a 52-year-old high school graduate with a certificate in banking from a

community college.  (1 N.T. at 160; Stipulated Facts ¶40).  She has worked in retail sales,

(1 N.T. at 169, 171-72; Ex. D-15, at 9-11), in accounts payable for a school, (1 N.T. at 167-

168), and for various banks in customer service, loan maintenance and assistant branch

management/trainee positions.  (1 N.T. at 162-167; Stipulated Facts ¶41).

2.    The Debtor's husband, Mr. Fowler, is also a high school graduate.  He has an associate's

degree in law enforcement from a community college, but worked for more than ten (10)

years as a mental health technician at various institutions.  (Ex. D-15, at 11-14; Stipulated

Facts ¶¶38, 39).


### B.  The Debtor's Real  Property and the GMAC Mortgage

3.    In February 2001, the Plaintiffs purchased residential real property located at 983

Allengrove Street, Philadelphia, Pennsylvania 19124 ("the Allengrove Property").

(Stipulated Facts ¶1; 1 N.T. at 118).

---

[5]        To the extent the witnesses at trial offered conflicting testimony on issues relevant to the
disposition of this adversary proceeding, my findings of fact reflect my resolution of those conflicts based
on my assessment of the witnesses' demeanor, motivations, credibility, and related factors.

4.     The Plaintiffs jointly held title to the Allengrove Property.  (Stipulated Facts ¶1).

5.     The Plaintiffs also own two (2) rental properties in Philadelphia.  Each rental property is subject to a mortgage.[6]

6.     On February 8, 2001, the Plaintiffs executed and delivered a mortgage on the Allengrove Property to GMAC Mortgage Corporation ("GMAC") in the principal amount of $126,976.00 (the "GMAC Mortgage").  (Id. ¶3).

7.     The GMAC Mortgage secured an underlying note for $126,976.00 between Mr. Fowler and GMAC ("the GMAC Note").  The GMAC Note bore an annual interest rate of 7.625 percent.[7]

8.     The GMAC Mortgage was recorded with the Philadelphia Department of Records on March 13, 2001.  (Stipulated Facts ¶4).

9.     In 2006, the monthly mortgage payments due GMAC on the Allengrove Property mortgage were approximately $1,200.00 a month.  (1 N.T. at 118).

### C.  The Plaintiffs' Deteriorating Financial Circumstances

---

[6]     The rental properties do not generate net income.  The tenants (one of whom is or was a family member) pay rent in an amount equal to the monthly mortgage payment associated with the property.  (2 N.T. at 117; Ex. D-15, at 18).

Notwithstanding the Debtor's experience as a landlord and her employment history, I do not find, as urged by Defendants Rauso and D&B, that the Debtor is either knowledgeable or sophisticated with respect to the type of real estate transactions involved in the December 11th Transaction, more fully described below.

[7]     The GMAC Mortgage and GMAC Mortgage Note were not introduced as exhibits at the trial of the adversary proceeding.  GMAC filed both documents in support of its proof of claim filed in the Debtor's previous bankruptcy case.  See discussion in Part III.D, infra.  I do not understand the parties to dispute the principal terms of the GMAC Mortgage and GMAC Mortgage Note; accordingly, I may take judicial notice of the interest rate of the GMAC Note.  See Fed. R. Evid. 201;  In re Scholl, 1998 WL 546607, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998).

10.   Prior to August 2004, both the Debtor and her husband were employed.

11.   In August 2004, the Debtor's husband was incarcerated and began serving a criminal

sentence of five (5) to seven (7) years.  (Stipulated Facts ¶2; 1 N.T. at 114).  Also in 2004,

the Debtor lost her job.  (1 N.T. at 167).

12.   Subsequently, the Debtor and her husband defaulted on the GMAC Mortgage.  (Stipulated

Facts ¶5).

13.   In April or May 2005, the Debtor regained employment.

14.   Between May 2005 until December 2006, the Debtor made some, but not all, of the

required monthly payments on the GMAC Mortgage.  (1 N.T. at 193).


### D.   The Debtor's First Bankruptcy Case

15.   On April 20, 2005, the Debtor filed a petition under chapter 13 of the Bankruptcy Code in

the United States Bankruptcy Court for the Eastern District of Pennsylvania, Bky. No. 05-

15637 ("the First Bankruptcy Case").  (Stipulated Facts ¶6).

16.   During the pendency of the First Bankruptcy Case, the Debtor obtained a job managing

accounts payable for a school.  (1 N.T. at 168-169; Ex. D-15, at 9-10).  The Debtor lost this

job in 2006.  (Ex. D-15, at 10; 1 N.T. at 169).

17.   On August 15, 2006, the Debtor's First Bankruptcy Case was dismissed for failure to make

plan payments.  (Stipulated Facts ¶6; see also Bky. No. 05-15637, Docket Entry Nos. 54,

58).


### E.   The Debtor's Husband Grants Her His Power of Attorney With Respect to the Allengrove Property

10

18.  On July 18, 2006, the Debtor's husband executed a power of attorney in favor of the

Debtor with respect to the Allengrove Property.  (Stipulated Facts ¶7; Ex. R-11).

19.  Mr. Fowler's power of attorney provides the Debtor with the power to:

> exercise or perform any act, power, duty, right or obligation whatsoever that [the
> Debtor's husband] now [has], or may hereafter acquire . . . in connection with, arising
> from, or relating to the home, property and real estate located at 983 Allengrove
> Road, Philadelphia, PA 19124.

 (Ex. R-11 ¶1).

20.  The power of attorney further provides that such

> rights, powers, and authority shall remain in full force and effect . . . until such time
> as [the Debtor's husband] is released from incarceration, or terminated prior to [his]
> release from incarceration by written notice signed by [him].

(Id. ¶8).


### F.  GMAC's Foreclosure Proceedings and Rauso's Initial Contact With the Plaintiffs

21.  On October 20, 2006, GMAC filed a foreclosure action against the Plaintiffs in the Court

of Common Pleas, Philadelphia County with respect to the Allengrove Property.  (See

Stipulated Facts ¶9).

22.  After GMAC filed the foreclosure proceeding, the Plaintiffs received letters from several

parties offering to help the Plaintiffs avoid foreclosure.  (1 N.T. at 119-20).  One such

letter, dated November 2, 2006, was signed by Lorraine Foster ("the November 2nd

Letter").  (See Ex. P-1; 1 N.T. at 120).  The November 2nd Letter stated:

> Dear Owner,
>
>     You may or may not know that a foreclosure action has been

<u>commenced against you</u>.  In fact, you may have received this letter prior
to even having been served with the complaint.  I know it's difficult to get
letters like this because I, myself, was facing foreclosure years ago.  The
good news is <u>you still have a number of options at this point</u> of which you
may not even be aware.  In fact, if you have an FHA loan you could be
eligible for a number of programs which would allow you to cure your
entire default.  Additionally, I have a number of contacts that will help
you get refinanced, where others may not have been able to do so
regardless of your credit score.

If either of these options fail, I would be interested in buying
your property even if it doesn't have any equity.  If I purchased it, I
would buy it subject to all the liens and encumbrances, would take all
the headache of fighting the bank or mortgage company off your hands
now before it's too late, tell you how others in your situation have been
successful in completely eliminating their personal debt and <u>not only
allow you to stay in the property for less than what you were paying
before but also allow you to buy the property back from us at a later date</u>.

(Ex. P-1) (emphasis added).  In closing, the letter provided a phone number the Plaintiffs

could call to discuss a "potential solution to [their] problem."  (<u>Id.</u>).

23.   Foster sent the November 2nd Letter to the Plaintiffs at Rauso's direction.  (2 N.T. at 7).

24.   The Debtor called the telephone number listed in the November 2nd Letter and reached

Foster.  (1 N.T. at 120).  Foster told the Debtor that she was Rauso's secretary and that

Rauso was the person to whom the Debtor needed to speak for assistance.  (1 N.T. at 120-

121).

25.   The Debtor called Rauso and left a voice message. (1 N.T. at 121).

### G.   <u>Rauso's Background and Business Model</u>

26.   Rauso claims to have worked in "real estate investing" for a number of years.  (Ex. D-16, at

9).[8]

27.    Rauso's initial business model for real estate investing involved what he termed "standard

investor type" transactions using "conventional methods".  He would purchase property,

make improvements to the property and try to "flip" (i.e., promptly resell) the property at a

profit.  (Ex. D-16, at 12, 120).

28.    By the time the Debtor received the November 2nd Letter, however, Rauso had become, by

his terminology, "more sophisticated."  He offered what may be loosely termed

"foreclosure prevention services,"  (see Ex. D-16, at 12; 2 N.T. at 72-76), in which he

targeted distressed properties that had entered foreclosure and attempted to persuade

property owners, who were desperate to avoid foreclosure, to transfer title to him.

Ostensibly, the purpose of the transfer was to facilitate Rauso's ability to negotiate a loan

modification or short sale with the owner's mortgage company.  As part of the

arrangement, Rauso also would sometimes enter into a lease/buy back agreement with the

property owners.  (2 N.T. at 72-76).

29.    Prior to sending the November 2nd Letter sent to the Plaintiffs, Rauso had determined that

he wanted to do business with them, i.e., he already had decided that he could expect to

extract a favorable profit from engaging in a "foreclosure prevention" transaction with

them.  (2 N.T. at 9).  The November 2nd Letter was a "door opener;" Rauso caused the letter

to be sent to the Plaintiffs to invite them to call him and do business with him.  (2 N.T. at

9).

---

[8]       He also claims to have been engaged previously in running painting companies,
marketing companies, jewelry companies, and telemarketing, mail order and non-profit concerns.  (Ex. D-16, at 122).

### H.  Rauso's Telephone Contacts With the Debtor at the Plaintiffs' Home

30.  When Rauso telephoned the Debtor at her home, he told the Debtor that he understood her situation and had gone through "the same thing" himself, i.e., foreclosure.  He told her that he was well qualified to assist the Plaintiffs because he had been specially trained on how to stop foreclosures.  (1 N.T. at 122).

31.  The Debtor told Rauso that her husband was in prison and that this had compounded the Fowlers' economic difficulties.  (2 N.T. at 53).  She also told him that her husband had given her his power of attorney regarding the Allengrove Property.  (2 N.T. at 11).

32.  The Debtor stressed to Rauso that she and her husband did not want to lose the Allengrove Property.  From his first conversation with the Debtor, Rauso learned that the Plaintiffs were not interested in selling the Allengrove Property and would not entertain any transaction that involved transfer of title to Rauso unless they retained the right to "buy back" or regain title to the Allengrove Property.  (See 1 N.T. at 135; 2 N.T. at 12, 43).

33.  Rauso told the Debtor that he "would be more than willing to help [the Plaintiffs] stop foreclosure."  (1 N.T. at 122).  Rauso advised the Debtor that the Plaintiffs could avoid foreclosure by temporarily transferring title to the Allengrove Property to him; he would lease the property back to them and they would have the right to buy it back in a year.  (1 N.T. at 122-123).

34.  A number of additional telephone calls followed the initial one, with Rauso initiating calls to the Debtor at her home more times than she called him.  (1 N.T. at 123).

35.  In these subsequent calls, Rauso pressured the Debtor to come to a decision.  He told her that she needed to "hurry up" because time was running out; she needed to act quickly or

14

the mortgage company would take her home.  (1 N.T. at 123).

### I.  GMAC Obtains a Default Judgment

36.  On December 6, 2006, GMAC obtained a default judgment in its foreclosure action against

the Plaintiffs with respect to the Allengrove Property.   (Stipulated Facts ¶9).

37.  GMAC's initial judgment was for $136,206.87, but that judgment subsequently was

amended to $149,357.71 plus interest at six (6) percent per annum from March 6, 2007

through the date of the sheriff's sale.  (Id.).

38.  Following receipt of the default judgment notice,[9] the Debtor had an emotional telephone

conversation with her husband in which she suggested working with Rauso as a possible

solution to their foreclosure problem.  Mr. Fowler agreed that the Debtor should get more

information from Rauso.  (1 N.T. at 123-124).

39.  Soon thereafter, the Debtor contacted Rauso, seeking more detailed information about how

he could help the Plaintiffs.  Rauso suggested that he come to the Plaintiffs' home and

explain what he could do for them.  He told the Debtor that she should be prepared to make

a decision at that time.  (1 N.T. at 125).[10]

---

[9]      I presume that the Debtor received the notice a few days after December 6, 2006, the date
the judgment was entered.  See Pa. R. Civ. P. 236(a)(2).

[10]      The Debtor also asked Rauso for and obtained the name of a "reference."  He gave her
the name Karen Mitchell.  The Debtor called Mitchell.  Mitchell told her that: (1) Rauso was "very
helpful;" (2) she had not been able to buy back her property from Rauso; (3) but that her parents did buy
the property back from Rauso, although, she was no longer residing there.  (Ex. D-15, at 31-33).

### J.   Rauso's December 11, 2006 Visit to the Plaintiffs' Home

40.   On December 11, 2006, Rauso visited the Plaintiffs' home.  (1 N.T. at 17-18, 125, 139).

His purpose was to convince the Debtor to agree to transfer title to the Allengrove Property

to him, provided that the power of attorney the Debtor had from her husband seemed valid

and durable.  (2 N.T. 10-11).

41.   Prior to Rauso's December 11th visit, the Plaintiffs had not yet decided whether to do

business with Rauso.  (1 N.T. at 134).

42.   In advance of his December 11th visit, Rauso (or his staff) prepared a number of documents

to bring with him.  (2 N.T. at 11-13).

43.   In anticipation of obtaining the Debtor's consent to transfer title to the Allengrove Property

to him, Rauso also brought along a notary named James Chapis.  (1 N.T. at 22-23, 125-

126; 2 N.T. at 13).

44.   Chapis is a licensed notary for Delaware County, Pennsylvania.  (1 N.T. at 33).

45.   Chapis introduced himself to the Debtor not as a notary, but as someone who was in

training with Rauso – i.e., he told the Debtor that Rauso was teaching him the business.  (1

N.T. at 126, 141).[11]

---

[11]   Coincidentally perhaps, Chapis came to know Rauso from having sought to avoid
foreclosure on his own home in 2005.  (1 N.T. at 36-38).  Mr. Chapis testified that he provided notary
services for Rauso for (18) months afterwards and then "moved on" and stopped working with Rauso.  (1
N.T. at 37-38).  He testified that during those eighteen (18) months, he typically notarized Land Trust
Agreements and Power of Attorney documents for Rauso.  (1 N.T. at 16).

I note that one document that was admitted into evidence at trial suggested that Chapis
had another role, beyond that of notary, with respect to Rauso's transaction with the Plaintiffs.  That
document, (see Ex. R-3, dated 2/16/07 and bearing the text: "RE: notice of inspection"), which is
discussed in further detail in Part III. U., infra, identifies Mr. Chapis as the "Secretary" of D&B, a
company owned and controlled by Rauso.  As is further discussed infra, Rauso induced the Plaintiffs to

(continued...)

46.    At the outset of his visit, Rauso asked to see a copy of the power of attorney the Debtor

received from her husband with respect to the Allengrove Property.  Presumably satisfied

that it was valid and durable, he retained the original and made a copy for the Debtor.  (2

N.T. at 15).

47.    At the December 11th visit, Rauso outlined his proposal to the Debtor again.  He told the

Debtor that she and her husband could avoid foreclosure and permanent loss of the

Allengrove Property if she temporarily transferred title to the property to him.  He

represented that he would lease the property back to them and that they would retain an

option to buy back the Allengrove Property at the end of a year.  (1 N.T. at 134).  In the

interim, Rauso told the Debtor, he would do what he needed to do "to keep the bank from

getting the property."  (2 N.T. at 52).

48.    While the Debtor was genuinely confused about the structure of the transaction, its details

and whether it might be harmful to her and her husband's interests, the Debtor understood

that the transaction with Rauso involved some alteration of her and her husband's

ownership of the Allengrove Property, supposedly to permit Rauso to work out some

forbearance agreement and/or loan modification with GMAC.[12]

---

[11](...continued)

grant D&B a $60,000.00 mortgage against the Allengrove Property as part of the December 11th
Transaction.  Also, D&B was later assigned the role of "property manager" of the Allengrove Property in
connection with the lease between the Plaintiffs and the Fowler Trust.  See Part III. K.6., infra, with
respect to Defendant D&B's role in the December 11th Transaction.  There was no testimony at trial about
Exhibit R-3.

[12]        At trial, the Debtor disputed whether Rauso told her that the transaction he described, and
that she ultimately agreed to enter (discussed below) involved transferring title to the Allengrove Property
(continued...)

### K.  **The Transactional Documents**

49.    At the December 11th  visit, Rauso asked the Debtor to sign seven (7) different documents

that he represented were designed to effectuate the transaction he had described to her.   (2

N.T. at 15).

50.    Rauso did not give the Plaintiffs copies of these documents to review prior to his arrival at

the Allengrove Property.  (2 N.T. at 12).

51.    Rauso also did not explain any of the documents to the Debtor except as described below.

(1 N.T. at 139; 2 N.T. at 15; see also 2 N.T. at 98 (Rauso's testimony: "[I]t's the duty upon

the person reading the document to understand the significance of that document.")).

### 1.  The Trust Agreement

---

[12](...continued)
to him.

That the Debtor may have been confused is not surprising.  She was presented with seven
(7) documents to review and sign in a meeting that lasted approximately forty-five (45) minutes.  See
Finding of Fact Nos. 49, 79, 85.  The documents were replete with legal terms, complicated cross
references and potentially contradictory provisions. Nevertheless, having had the opportunity to question
her at trial about her understanding of the transaction and based on my assessment of her trial testimony
as a whole, I do not find her testimony to be completely accurate and therefore, I find against her as
described in Finding of Fact No. 48 above.

Despite the lack of sophistication the Debtor exhibited on the witness stand (which I find
genuine), I find it impossible to accept the Debtor's contention that she was unaware that she was
modifying her and her husband's ownership rights when she signed the documents on December 11th.
She had sufficient life experience to understand and appreciate that the various documents she signed
would significantly affect her ownership rights.  Rather, I find that she understood that she was
transferring title to the Allengrove Property, but nonetheless did so because she was comforted by
Rauso's assurance that she had the right to get the property back so long as she paid him some
undetermined sum of money.  In general, I believe that the Debtor acted partly on trust (in that she was
swayed by Rauso's representation that he was there to help her and not hurt her) and partly out of
desperation (in that she seemed to have no viable alternatives to Rauso's suggested plan of action).

52.    The first document Rauso asked the Debtor to sign is titled "Land Trust Agreement" ("the

Trust Agreement").  (Ex. P-2; Ex. R-12).

53.    The parties to the Trust Agreement are identified as being the Plaintiffs, who are referred to

by the defined term "Beneficiary," and Rauso, who is identified as "Trustee for the Fowler

Trust."  (Ex. P-2; Ex. R-12).

54.    The Trust Agreement provides that it "contains the entire understanding between the

parties hereto and may be amended, revoked or terminated only be [sic] written

agreement,"  (Ex. P-2 ¶17; Ex. R-12 ¶17).[13]

55.    The Trust Agreement purports to set up a "Fowler Trust", the purpose of which was for

Rauso to "take and hold title" in the Allengrove Property and "to preserve the same until its

sale or other disposition."  (Ex. P-2 ¶2; Ex. R-12 ¶2).[14]

---

[13]    None of the other documents that Rauso presented to the Debtor for her signature on
December 11th contained such a clause.

[14]    Exhibit P-2 is the copy of the Trust Agreement that Rauso forwarded to the Debtor some
time after December 11th, after she called him to request copies of the documents she had signed.  (See
discussion infra III. M. & 1 N.T. at 141).  Exhibit R-12 is the copy of the Trust Agreement that Rauso
introduced at trial.  Although they appear principally to be the same document, I note the following
differences:

> (1) the text on page 1 of Exhibit R-12 fits on the page differently than the text on
> page 1 of Exhibit P-1;
>
> (2) Exhibit R-12 contains page 2; there is no page 2 to Exhibit P-2 (i.e., the
> Plaintiffs' copy of the Trust Agreement), the page that included the provision
> regarding their contractual right to buy back the Allengrove Property);
>
> (3) Exhibit R-12 contains a Schedule B (which says that the Allengrove Property
> is Trust Property) and a Schedule C (which states that the Plaintiffs are the
> Beneficiary) and Exhibit P-2 does not contain a copy of those two (2) Schedules;
> and

(continued...)

56.    The Trust Agreement purports to provide the Beneficiary and Trustee with certain rights

and obligations:

    a.    The Trust Agreement provides the **<u>Beneficiary</u>** with the right to, <u>inter</u> <u>alia</u>:

        1.    "lease, manage and control the Trust Property [<u>i.e.</u>, the Allengrove Property];"

        2.    " direct the Trustee with regard to the disposition of the title to the Trust Property;"

        3.    "receive the profits, earnings, avails and proceeds from the rental, sale, mortgage or other disposition of the Trust Property;"

        4.    "assign any part or all of their interests under [the] Trust;" and

        5.    terminate the Trust Agreement "thirty (30) days or more after the date upon which the Beneficiary agrees in writing to said termination".

(Ex. P–2 ¶¶ 13, 14, 22; Ex. R-12 ¶¶13, 14, 22 ).

    b.    With respect to the **<u>Trustee</u>**, the Trust Agreement states that he, <u>inter</u> <u>alia</u>,:

        1.    "will hold the Trust Property according to the terms and conditions of this Land Trust Agreement for the purposes, terms and conditions contained herein until such time as all of the Trust Property has been sold or otherwise conveyed, or until this trust has terminated";

        2.    "shall . . . have the power to make and execute contracts for the lease or sale of the Trust Property, mortgages secured by the Trust Property . . . to otherwise dispose of the Trust Property" <u>as directed by the Beneficiary</u> and "<u>shall exercise his powers only upon the written direction of a majority in interest in the Beneficiary</u>";

        3.    "shall give Rhodie D. Fowler and Larry D. Fowler the<u> first right</u>

---

[14](...continued)

        (4) the acknowledgment page on Exhibit R-12 contains an interlineation not found on same page of Exhibit P-2.  More specifically, while both acknowledgments state that Larry D. Fowler and Rhodie D. Fowler "personally appeared" before the notary, Exhibit R-12 contains the notation "(Rhodie Fowler as Power for Attorney for)" and an arrow pointing to the text regarding Larry Fowler's having "personally appeared".

> to re-purchase the Trust property only if Rhodie Fowler complies
> with all of the terms and conditions of the lease agreement, dated
> December 11, 2006 . . . .  Said right to re-purchase the property will
> be rendered void and of no legally binding effect the day said lease
> is breached by either Rhodie D. Fowler or Larry D. Fowler" ("the Buy Back
> Clause");[15] and

4. shall be compensated $25.00 a hour for any and all services he
renders for the Trust and shall have a lien on the Trust [P]roperty
for any unpaid compensation or unreimbursed expenses.

(Ex. P-2 ¶¶2, 3; Ex. R-12 ¶¶2, 3, 4, 5 & Sch. D) (emphasis added).[16]

---

[15]     The copy of the Trust Agreement that Rauso later provided to the Debtor some days after December 11th is missing page 2, which is the page that includes the Buy Back Clause.  See n.14, supra.

[16]     The Trust Agreement also contains the following provisions, all of which appear aimed at addressing issues related to future title transfers:

1. the Trust Agreement shall not be recorded in any jurisdiction.  If it is
recorded, it shall not "be notice of any interest which may affect
the title or the powers of the Trustee;"

2. no party to whom the Trustee might transfer the Trust property
"shall be obliged to see to the application of any purchase money,
rent, or money borrowed or otherwise advanced on the property;
to see that the terms of the Trust Agreement have been complied
with; to inquire into the authority, necessity or expediency of any
act of the Trustee; or be privileged to inquire into any of the terms
of this Trust Agreement"; and

3. "[e]very deed, mortgage, lease or other instrument executed
by the Trustee . . . shall be conclusive evidence in favor of every
person claiming any right, title or interest under the Trust that at
the time of its delivery the Trust created under this Agreement was
in full force and effect; and that the instrument was executed in
accordance with the terms and conditions of this Agreement . . .
and is binding upon all Beneficiary under it; that the Trustee was
duly authorized and empowered to execute and deliver every
such instrument . . . ."

(Ex. P-2 ¶11, 16; Ex. R-12 ¶11, 16) (emphasis added).

(continued...)

## 2.  The Warranty Deed to Trustee

57.    The second document that Rauso asked the Debtor to sign on December 11th is titled

"Warranty Deed to Trustee" (herein, "Fowler-Rauso Deed").  (See Ex. P-3; Ex. R-13).[17]

58.    The Fowler-Rauso Deed states that "for and in consideration of $5.00," the Plaintiffs grant

Rauso, as Trustee for the Fowler Trust, the Allengrove Property in "fee simple forever" for

"the uses and purposes . . . in said Trust Agreement".  (Ex. P-3, at 2; Ex. R-13, at 2).[18]

59.    Despite the reference in the Fowler-Rauso Deed to its having been executed in

consideration for $5.00, Rauso did not pay any money to the Plaintiffs for the transfer of

title.  (1 N.T. at 134; 2 N.T. at 87).

## 3.  Assignment of Beneficial Interest in Land Trust

60.    The third document Rauso asked the Debtor to sign is titled, "Assignment of Beneficial

---

[16](...continued)
        These provisions, which purport to minimize the obligations of a subsequent purchaser, appear to be an attempt to override Pennsylvania law on the "exercise of ordinary diligence" required of subsequent purchasers.  See Part IV.B.1, infra.

[17]        Exhibit P-3 is the copy of Fowler-Rauso Deed that Rauso forwarded to the Debtor after she called him and requested copies of the documents she had signed on December 11, 2006.  Exhibit R-13 is the copy of the Fowler-Rauso Deed that Rauso introduced at trial.  Although they appear principally to be the same document, like the Trust Agreement, the acknowledgment page on the exhibit that Rauso proffered contains an interlineation not found on same page of Exhibit P-3.  With respect to this latter point, while both acknowledgments state that Larry D. Fowler and Rhodie D. Fowler "personally appeared" before the notary, Exhibit R-13 contains the notation "(Rhodie Fowler as Power for Attorney for)" and an arrow pointing to the text regarding Larry Fowler's having "personally appeared".

[18]        The Fowler-Rauso Deed contains language similar to that contained in the Trust Agreement, purporting to minimize obligations of parties seeking to purchase the property from the Trustee.  (Ex. P-3, at 2-3; Ex. R-13, at 2-3); see also n.16, supra.

Interest in Land Trust" ("the Beneficiary Assignment").  (See Ex. P-6; latter part of Ex. R-14).[19]

61.   The Beneficiary Assignment states that the Debtor and her husband (i.e., the beneficiaries of the Trust Agreement) assign 100% of their rights and beneficial interests under the Trust Agreement to REO Investment Corporation ("REO").  (Ex. P-6; latter part of Ex. R-14).

62.   At the time, REO was a company owned and controlled by Rauso.  (2 N.T. at 78-79).[20]

### 4.  Addendum Agreement

63.   The fourth document that Rauso asked the Debtor to sign is titled "Letter of Agreement and Addendum" (herein, "the Addendum Agreement").  (See Ex. R-9).  In the Addendum

---

[19]      Exhibit P-6 is the copy of the Beneficiary Assignment that Rauso forwarded to the Debtor after she called and requested copies of the documents she signed on December 11th.  The latter part of Exhibit R-14 is the copy of the Beneficiary Assignment that Rauso introduced into evidence. Unlike Exhibit P-6, the attachment to Exhibit R-14 contains an acknowledgment page (bearing the language used in the other documents described above, i.e., that the Plaintiffs personally appeared before Chapis) and a notarial seal.

[20]      Rauso testified that he presented the first three documents to the Debtor in the order in which they appear in the textual discussion – i.e., the Trust Agreement, the Fowler-Rauso Deed and then the Beneficiary Assignment – and that he did so by design.  (See Ex. D-16, at 91).  In his view, the moment the Debtor signed the Beneficiary Assignment, the Plaintiffs effectively relinquished all rights that had just been granted to them as the "Beneficiary" of the Trust Agreement, which would appear to include, at minimum: (a) the power to direct the Trustee with respect to any proposal to sell, rent or lease the Allengrove Property, (b) the ability to prevent the Trustee from mortgaging the property, (c) the right to terminate the Trust Agreement, and (d) the right to receive profits and earnings from any disposition of the Allengrove Property.  (See 2 N.T. at 28-29).

Rauso did not explain how the Plaintiffs could grant a mortgage in favor of D &B (through the sixth document the Debtor signed later in the transaction, see Finding of Fact Nos. 67-68) after relinquishing all of their rights in the property through execution of the first three (3) documents.

I also note that the Buy Back Clause in the Trust Agreement is given to the Plaintiffs by name, and not to the Trust Beneficiary.  Presumably then, even under Rauso's view, the Plaintiffs' right to repurchase the Allengrove Property survived the Beneficiary Assignment.  However, that right is described in the Trust Agreement as being "rendered void and of no legally binding effect the day said lease is breached by either Rhodie D. Fowler or Larry D. Fowler."  See discussion infra regarding the Lease.

Agreement, the Debtor was required to initial certain statements regarding the Fowler

Trust's so-called "[p]urchase" of the Allengrove Property:

    a.  the Plaintiffs' loan [with GMAC] will stay in their names until "it's paid off or
assumed by a future buyer;" the Fowler Trust has "no intentions of assuming said
loan and . . . no promises have been made . . . that the loan will be assumed or paid
off"; and

    b.  by signing the deed, the Plaintiffs are "relinquishing all ownership rights and interests
in the Allengrove Property and the Allengrove Property is "being purchased [by the
Fowler Trust] subject to the liens and encumbrances of record".

(Ex. R-9).

### 5. Power of Attorney

64.  The fifth document that Rauso asked the Debtor to sign on December 11th is titled "Power

of Attorney" (herein, "Debtor-Rauso POA").  (See Ex. P-4).  This document states that the

Debtor appoints Rauso her attorney-in-fact to "act in, manage and conduct all my estate

and all my affairs."

65.  Rauso told the Debtor that this document would enable him to protect the Plaintiffs when

he arranged to have their mortgage paid.  (1 N.T. at 145).

66.  Rauso gave the Debtor a Power of Attorney form for her husband and asked the Debtor to

mail it to her husband and have it signed and mailed back to Rauso.  (1 N.T. at 144).

### 6. The Fowler-D&B Mortgage and Defendant D&B

67.  Rauso presented the Debtor with a sixth document to sign that is titled "Mortgage" (herein,

"Fowler-D&B Mortgage").  (See Ex. R-8).

68.  The Fowler-D&B Mortgage is dated December 11, 2006.  In it, the Plaintiffs are identified

as Borrowers and Mortgagors.  Defendant D&B is identified as the Lender and Mortgagee.

69.    D&B is an entity created and controlled by Rauso.  (Stipulated Facts ¶14).

70.    With respect to his transaction with the Plaintiffs, Rauso used D&B as a vehicle to obtain

further compensation, derived from the equity in the Allengrove Property.[21]

71.    The Fowler-D&B Mortgage purports to grant a mortgage to D&B to secure a $60,000.00

Note due to be paid in full "not later than January 10, 2007" – i.e., less than 30 days after

Rauso's visit to the Debtor's home.  (See Ex. R-8).

72.    Despite reference to it in the Fowler-D&B Mortgage, there is no note or indebtedness to

D&B Mortgage underlying the Fowler-D&B Mortgage.  (2 N.T. at 86-87).  Neither Rauso

nor D&B loaned and/or paid the Debtor or her husband any money.  (2 N.T. at 134; 2 N.T.

at 87).


## 7.  Residential Lease

73.    The seventh and last document that Rauso asked the Debtor to sign is titled "Residential

Lease" ("the Lease").   (See Ex. P-5; Ex. D-14).

74.    The Plaintiffs and D&B, as "property manager" for the Fowler Trust, are the parties to the

Lease.  (Ex. P-5, at 1; Ex. D-14, at 1).

75.    The Lease provides that D&B will lease the Allengrove Property to the Plaintiffs from

December 11, 2006 to November 30, 2007.  (Ex. P-5; Ex. D-14).

76.    The Lease further states, inter alia, that the Debtor and her husband must pay rent of

---

[21]        (See 2 N.T. at 29 (Rauso claiming he presented Plaintiffs with a mortgage for $60,000.00
to D&B to "protect whatever equity was left in that property"), 84-87 (Rauso had Plaintiffs grant D&B a
mortgage so that no other liens would be recorded before his lien – the D&B mortgage – and gain priority
over his claim)).

$1,000.00 per month in advance on the first day of each month.  (Ex. P-5; Ex. D-14).

77.    The Debtor balked at seeing the $1,000.00 amount for rent in the Lease.  She told Rauso

that she could not afford to pay it.  (1 N.T. at 146; 2 N.T. at 20).

78.    Rauso told the Debtor "not to worry about it."  He assured the Debtor that he would

accommodate her inability to pay rent, i.e., he would "work something out" for her and that

she should call him when the rent was due and arrangements would be made.  (1 N.T.

146).[22]

---

[22]    The Debtor was unemployed when Rauso originally contacted the Plaintiffs via the
November 2nd Letter.  (2 N.T. at 117).  Later in November, she obtained a part-time job that paid
approximately $250.00 a month.  (Id.).  She did not receive her first paycheck until some time in
December 2006.  (Id. at 119). Other than this position, the Debtor had no other sources of income.  (Id. at
117).

The Debtor told Rauso that she had plans to try to open a daycare facility that she could
operate from the Allengrove Property.  If those plans bore fruit, she expected to earn sufficient money to
pay the rent Rauso wanted.  The Debtor advised Rauso that before she could operate a daycare, she first
would need, at minimum, to retrofit the Allengrove Property, have an inspection done and obtain certain
certificates and licenses.  (2 N.T. at 90-91; see also 2 N.T. at 125-128).  Thus, it must have been apparent
to Rauso that the Debtor's income would not increase appreciably in the immediate future.

### L.  **The Debtor Signs the Transactional Documents; the Right to Cancel**

79.    The Debtor, acting in her individual capacity, and pursuant to the Power of Attorney

provided to her by her husband, signed the Trust Agreement, Fowler-Rauso Deed, the

Lease, Addendum Agreement, Fowler-D&B Mortgage,[23] the Debtor-Rauso Power of

Attorney and Beneficiary Assignment.  (See Stipulated Facts ¶¶10, 11, 42; 1 N.T. at 138

(Ex. P-2 to P-6), 140 (Trust Agreement), 142 (Fowler-Rauso Deed), 144-145 (Debtor-

Rauso POA), 224 (Addendum Agreement).[24]

---

[23]    Although the Debtor testified at trial that she did not recall being asked to sign a
mortgage on December 11th and that she could not think of a reason why she would sign one, (1 N.T. at
136), I find that she did sign this document.  The signature on the Fowler-D&B Mortgage bears a marked
similarity to the other documents the Debtor signed on December 11th.  At trial, the Debtor was never
asked whether the signature on the Fowler-D&B Mortgage was hers.

      In making the finding that the Debtor signed this document, however, I do not discredit
the Debtor's testimony that she does not recall being asked to grant D&B a mortgage on the Allengrove
Property and that she did not understand why she would grant one.  The mortgage does not secure any
underlying indebtedness.  Additionally, Rauso did not explain the purpose of any of the documents he
presented to the Debtor for signature on December 11th.

      The Fowler-D&B Mortgage was not included among the documents that Rauso later
copied and sent to the Debtor. Additionally, as Mr. Chapis also noted, the Fowler-D&B Mortgage
contains no notary seal on the acknowledgment page.  (1 N.T. at 20; see Ex. R-8).

[24]    Attached to the Plaintiffs' Complaint as part of Exhibit D is an eighth document the
Debtor contends (in the Complaint) that Rauso asked her to sign on December 11, 2006.  This document
is addressed to GMAC Mortgage Corp., "RE: Loan No. 0508187309; 983 Allengrove St. Phila. PA" and
states:

         To whom it may concern,

               I/we hereby authorize you to release any and all information, to Gennaro
               Rauso or Concetta Hughes, that he/she may require for the purpose of
               discussing my/our loan or any credit transactions or loan transfers for the
               above referenced loan number pertaining to the above referenced
               property.

               Your attention is appreciated.

                                                          (continued...)

80.  The Debtor signed these documents in her home in Philadelphia.  (1 N.T. at 141; 1 N.T. at

16).

81.  Acting as notary public, Mr. Chapis witnessed the Debtor signing these documents. (1 N.T.

at 17-22).

82.  The Debtor had no role in preparing any of the any of the documents she signed. (1 N.T. at

142).

83.  None of the documents that Rauso presented to the Debtor on December 11th contained or

constituted a "Notice of Cancellation" as that term is described in 73 Pa. Stat. Ann. §201-7.

(See, e.g., 2 N.T. at 16).

84.  Rauso did not orally advise the Debtor that she and her husband had a right to cancel their

transaction with him.[25]

85.  Settlement on the Plaintiffs' transaction with Rauso took approximately forty-five (45)

minutes.  (1 N.T. at 20, 137).

86.  Rauso did not leave a copy of any of the signed documents with the Debtor on December

11, 2006.  (1 N.T. at 137).


   **M. The Plaintiffs Act Promptly to Cancel the December 11th Transaction;
       A Sheriff's Sale is Scheduled for the Allengrove Property**

---

[24](...continued)
(See Exhibit D to Adv. Docket Entry No. 1; Ex. R-3).  It purports to be signed by the Debtor on her own
behalf and on behalf of her husband and provides the Plaintiffs' social security numbers.  Although this
document was admitted into evidence, (see Ex. R-3), there was no testimony about it at trial.


[25]     It is Rauso's position that the Plaintiffs never possessed the right to cancel.  (2 N.T. at 16;
1 N.T. at 150).

87.  After the completion of the December 11th Transaction, at the Debtor's request, Rauso sent

the Debtor copies of five (5) of the documents she signed on December 11th : (1) the Trust

Agreement, (2) the Fowler-Rauso Deed, (3) the Debtor-Rauso POA, (4) the Beneficiary

Assignment and (5) the Lease.  (1 N.T. at 137-138; 2 N.T. at 34; see Exs. P-2, P-3, P-4, P-

5, P-6).  He did not send her a copy of the Fowler-D&B Mortgage or the Addendum

Agreement.

88.  After receiving copies of the five (5) documents from Rauso, sending certain copies to her

husband, and after consulting with her husband, the Debtor called Rauso on or about

January 3, 2007 and told him that she and her husband wanted to cancel the transaction.  (1

N.T. at 147-149, 213-214; 2 N.T. at 17).

89.  In response to the Debtor's statement that the Plaintiffs were cancelling the December 11th

Transaction, Rauso told the Debtor that the Plaintiffs could not rescind.  (1 N.T. at 150,

214).

90.  Following her telephone conversation with Rauso, the Debtor consulted with a friend who

was an attorney about the transaction.  That attorney instructed the Debtor to call Rauso

and ask him to call the attorney.  (1 N.T. at 153).  The Debtor did so.  (1 N.T. at 153).

91.  Also on January 3, 2007, the Debtor's husband sent a letter to Rauso, stating that, after

reviewing certain documents, he believed that Rauso had "deceived [his] wife" and was not

"working in [the Plaintiffs'] best interest" and that Rauso's "questionable behavior and

criminal-like acts demonstrate that [he] [did] not have [the Plaintiffs'] best interest, legal or

otherwise at heart."  He informed Rauso that, as of January 3rd, the power of attorney he

had granted his wife with respect to the Allengrove Property was effectively revoked.  (1

29

N.T. at 151; Ex. P-7).

92.   On January 17, 2007, the Debtor followed up on her phone calls to Defendant Rauso by

sending him (and D&B) a letter via certified mail to rescind the December 11th Transaction.

(1 N.T. at 151-152; Ex. P-8).

93.   After January 17, 2007, the Plaintiffs and Rauso had no further communications.  (2 N.T. at

61).[26]

94.   Meanwhile, on January 11, 2007, GMAC's foreclosure counsel sent the Plaintiffs notice

that a sheriff's sale of the Allengrove Property had been scheduled for March 6, 2007.

(Stipulated Facts ¶13).


   **N.  Rauso Sells the Allengrove Property**

95.   Unbeknownst to the Plaintiffs, on January 20, 2007, Rauso entered into an Agreement of

Sale to sell the Allengrove Property to Borso and Maness.  (Stipulated Facts ¶15; 1 N.T. at

155).

96.   Prior to entering into Agreement of Sale with Borso and Maness, Rauso never offered to

sell the Allengrove Property back to the Debtor and her husband.  (2 N.T. at 45).[27]

---

[26]      Rauso testified that, after the Debtor called to rescind, he saw no further point in
communicating with the Debtor because she was "under this frame of mind that she's just going to try to
undo this whole thing.  Too late."  (2 N.T. at 61).


[27]      Rauso testified that once the Debtor called to rescind, he knew "this deal wasn't going to

go the way it was supposed to go" and he was no longer willing temporarily to waive the Lease's
requirement of $1,000.00 a month rent.  (2 N.T. at 22, 77, 91).  He claimed that nonpayment of January's
rent breached the Lease and the Trust Agreement and negated the Plaintiffs's rights under the Buy Back
                                                                                            (continued...)

97.     At the time Maness agreed to purchase the Allengrove Property, Maness already had

        worked with Rauso on other real estate transactions.  (Ex. D-16, at 54; 1 N.T. at 231).[28]

98.     As between Maness and Defendant Borso, Maness was the more active, "instrumental"

        party in making the arrangements to purchase the Allengrove Property from Rauso.  (1

        N.T. at 230).  Maness introduced Borso to Rauso as someone who had "decent credit" and

        could get a mortgage to finance the acquisition.  (Ex. D-16, at 53).

99.     Rauso told Maness that the Allengrove Property "was a good investment."  (1 N.T. at 233).

        Maness determined that there was "a lot of money to be made on the back end," i.e., upon

        resale of the Allengrove Property.  (1 N.T. at 233-234).

100.    Prior to agreeing to purchase the Allengrove Property transaction, Maness knew that the

        Allengrove Property "was a foreclosure."  (1 N.T. at 233).

---

[27](...continued)
Clause.  Indeed, he contended that rent for December was owed immediately upon the execution of the
Lease on December 11th and that the Plaintiffs immediately were in default of their obligations under the
Lease.

        Rauso claimed that, had his deal with the Plaintiffs gone the way "it's supposed to have
gone," (i.e., if instead of rescinding the transaction, the Debtor had paid her January rent), he would have
"worked a loan modification with the bank," to give her time to reestablish her credit and then made a
profit in reselling the property back to the Debtor and her husband.  (2 N.T. at 50-51).


[28]     Maness testified that all of the real estate transactions that he has done with Rauso have
"gone bad."  (1 N.T. at 232).  Under certain circumstances, such testimony might be relevant to, and
negatively impact on, one of Maness' claims or defenses in this litigation – i.e., that he was a bona fide
purchaser for value with respect to the Allengrove Property, a contention that is analyzed in detail in the
legal discussion that follows.  However, the record on this point was not sufficiently developed to permit
any conclusions to be drawn regarding the nature of these other transactions, the reason(s) for their failure
or whether any of the transaction failed before Maness decided to acquire the Allengrove Property from
the Rauso-controlled entity.

        As for Defendant Borso, although Defendant Borso had no business dealings with Rauso
prior to buying the Allengrove Property, he has had subsequent business dealings with him.  (Ex. D-16, at
56; 1 N.T. at 230).

101. Prior to selling the Allengrove Property to Borso and Maness, Rauso told Maness that there
was a "tenant" in the Allengrove Property, but that before Borso and Maness went to
settlement, the tenant would be out of the property.  (Id.).  This was a condition of Maness'
and Borso's "deal" with Rauso.  (Id.).

102. Rauso did not tell Maness that he had promised the Plaintiffs the right to buy back the
Allengrove Property.  (1 N.T. at 236).  Nor did he tell Maness that the Plaintiffs had taken
steps to rescind their transaction with Rauso.  (1 N.T. at 246).[29]

103. Prior to purchasing the Allengrove Property from Rauso, Maness did not visit the
Allengrove Property to see who was living there or whether the purported "tenant" claimed
any rights to the property.  (1 N.T. at 234-35).


**O.  The Fowler-Rauso Deed and Fowler-D&B Mortgage Are Recorded**

104. On January 24, 2007, in preparation for the sale to Borso and Maness, Rauso recorded the
Fowler-Rauso Deed, (i.e., the warranty deed pursuant to which the Plaintiffs granted title to
the Allengrove Property to Rauso as "Trustee" of the Fowler Trust), with the Philadelphia
Department of Records at document identification number 51618092.  (Stipulated Facts
¶12).

105. Rauso recorded the $60,000.00 Fowler-D&B Mortgage on January 11, 2007 at document
identification number 51609309.   (See Ex. CW-4 at 5).

---

[29]        Maness testified that he would have walked away from the deal if he had known that the
person who was living in the property had attempted to rescind the transaction that gave title in the
Allengrove Property to Rauso.  (1 N.T. at 246).

32

### P. **The Title Agent's Investigation Into Rauso's Title**

106. John DiGiacomo ("DiGiacomo") is a licensed title agent who has owned an abstract title

agency for approximately twenty (20) years. (1 N.T. at 85). He is also an attorney with the

firm DiGiacomo & Levin. (1 N.T. at 83).

107. DiGiacomo was the Title Agent for the closing on the Rauso-Borso and Maness

transaction, acting on behalf of Borso and Maness as well as Countrywide's predecessor in

interest.

108. First American Title Insurance Company (herein, "First American") provided the title

insurance policy for the Allengrove Property transaction between Rauso as seller and

Borso and Maness as purchasers ("the Rauso-Borso/Maness Transaction"). (1 N.T. at 85-

86; Ex. CW-11).

109. DiGiacomo's role with respect to the Allengrove Property closing involved ordering a title

search, assessing the results of the title search, causing the settlement sheet to be prepared,

reviewing the settlement sheet, holding the closing, issuing a mortgagee policy and giving

a title policy to the mortgagee (i.e., Money Warehouse) and the buyers (i.e., Borso and

Maness). (1 N.T. at 86).

110. DiGiacomo obtained a title search and title insurance commitment for the Allengrove

Property through his underwriter. Exhibit CW-4 is the title insurance commitment

document ("the Title Insurance Commitment") that Mr. DiGiacomo received from his

underwriter with respect to the Allengrove Property. (1 N.T. at 87). Its effective date is

January 29, 2007. (Ex. CW-4).

111. The purpose of the Title Insurance Commitment is tell "everyone what the title company

agrees to and what exceptions there would be to the title policy." (1 N.T. at 88). In addition to describing the interest in land that is being insured and identifying the person in whom title is vested and other salient details, the Title Insurance Commitment lists requirements that must be met before title will be insured and identifies exceptions to the title policy that will exist unless the exceptions are "removed" prior to closing. (1 N.T. at 106).

112. The Title Insurance Commitment states that, as of January 29, 2007, title to the Allengrove Property was held by "Gennaro Rauso, Trustee for the Fowler Trust, and not personally under the provisions of a trust agreement dated the 11ᵗʰ day of December 2006." (Ex. CW-4 ¶3(B)). It also states that Rauso obtained title by warranty deed from the Plaintiffs on December 11, 2006. (Id.).

113. Section One of the Title Insurance Commitment lists certain "Requirements" ("the Requirements") that must be satisfied before First American would insure title on behalf of Borso and Maness and for the mortgage lender providing the financing for Borso and Maness' purchase of the Allengrove Property. (See Ex. CW-4; 1 N.T. at 106-107, 249).

114. Included among the Requirements on the Title Insurance Commitment, were the following:

As to Gennaro Rauso, Trustee for the Fowler Trust, and not personally under the provisions of a trust agreement dated the 11ᵗʰ day of December, 2006, known as the Trust Number 983, proof must be furnished that:

a. The trustees have the authority to transfer.

b. That the trust is in existence (has not been terminated or revoked).

As to Gennaro Rauso, Trustee for the Fowler Trust, and not personally under the provisions of a trust agreement dated the 11ᵗʰ day of December 2006, known as Trust Number 983, a copy of the trust agreement and all addendums and amendments thereto must be furnished.

34

(Ex. CW-4, at Requirement 9, at 2-3) (emphasis added).

115. DiGiacomo considered Rauso's authority to transfer legal title to the Allengrove Property

important in deciding whether First American could or should insure title.  (1 N.T. at 105).

116. Prior to settlement on the Allengrove Property acquisition, DiGiacomo was provided with a

copy of the Trust Agreement.  (1 N.T. at 108, 110).

117. DiGiacomo considered the Requirements discussed in Findings of Fact Nos. 113 and 114

to have been satisfied by his review of the Trust Agreement.  (1 N.T. at 107-108, 105-106,

100-101).[30]

118. Notwithstanding the inclusion of the Buy Back Clause in the Trust Agreement, Mr.

DiGiacomo testified that he did not know that the Plaintiffs had been given the right to buy

back the Allengrove Property.  (1 N.T. at 97).[31]

-----

[30]    When an exception or requirement identified by the Title Insurance Commitment has
been satisfied to First American's standards, the word "REMOVED" is stamped near the exception or
requirement.  (1 N.T. at 87-88, 105-107; see also Ex. CW-4).  On the Title Insurance Commitment,  the
following relevant Requirements were marked "REMOVED":

      a.   that a copy of the Trust Agreement and all addendums be provided;

      b.   that proof be provided that Rauso had the authority to transfer title; and

      c.   that proof be furnished that the Trust Agreement was still in force and
          had not been terminated.

(Ex. CW-4).


[31]    DiGiacomo did not bring to trial the copy of the Trust Agreement he reviewed.  If
DiGiacomo was given and reviewed the same copy of the Trust Agreement that the Debtor received (see
Ex. P-2), that copy may have been missing page 2, which contained the Buy Back Clause.  However, the
omission of page 2 is very easy to detect.  Although the Trust Agreement does not contain page numbers,
its paragraphs are sequentially numbered and, without page 2, page 3 picks up in the middle of a
paragraph (the beginning of the paragraph is on page 2) and contains paragraph numbers that make clear

(continued...)

119. If DiGiacomo was aware that someone had an enforceable right to buy back the Allengrove
Property, he would not have issued a title policy without first taking some other action
(e.g., discussing it with the parties and his underwriter).  (1 N.T. at 96-97).

120. Prior to the settlement on the sale of the Allengrove Property to Borso and Maness,
DiGiacomo did not attempt to ascertain whether someone other than the current titleholder,
i.e., Rauso as Trustee for the Fowler Trust, was living there.  (1 N.T. at 91-92).

121. Section Two of the Title Insurance Commitment is titled "Exceptions" ("the Exceptions").
The Exceptions section of the Title Insurance Commitment contains, inter alia, a list of the
liens and encumbrances that the title search on the Allengrove Property revealed.  This
section lists, inter alia, the GMAC Mortgage, the Fowler-D&B Mortgage, certain
judgments and a municipal lien for gas service.  (Ex. DW-4, Schedule B).

122. DiGiacomo used "the Exceptions" section of the Title Insurance Commitment to prepare
the HUD-1 settlement statement, (see Ex. CW-3).

123. Because outstanding liens and encumbrances were paid at the closing of the Allengrove
Property acquisition, those exceptions in Section Two of the Title Insurance Commitment

---

[31](...continued)
that something is missing.  Accordingly, if DiGiacomo reviewed Exhibit P-2 (or a copy thereof), a
minimally diligent review should have caused him to note that a page was missing and to request a copy
of it.

In any event, the record is devoid of evidence to suggest that the Trust Agreement
DiGiacomo reviewed had any missing pages.  Further, there is no evidence to suggest that Rauso
defrauded DiGiacomo, for example, by providing him with a falsified trust agreement.  Indeed, no
evidence was presented to tell me who provided DiGiacomo with the copy of the Trust Agreement he
reviewed.  It appears to be a fair assumption that Rauso produced it.  The Plaintiffs were unaware of the
sale to Borso and Maness and Rauso did not record the Trust Agreement.

The salient point is that the Buy Back Clause is in the Trust Agreement and, in an
exercise of diligence, DiGiacomo should have noted its existence.

were marked REMOVED.  (1 N.T. at 87-88; Ex. CW-4).

124. First American issued a Policy of Title Insurance, dated March 5, 2007, for the Rauso-

Borso/Maness Transaction.   (See Ex. CW-11).


### Q. The February 2007 Settlement; the Money Warehouse Mortgage; the Borso Note; the Appraisal

125. Settlement on the Rauso-Borso/Maness Transaction occurred on February 15, 2007.

(Stipulated Facts ¶16).

126. Money Warehouse, Inc. ("Money Warehouse") provided financing for the purchase of the

Allengrove Property.

127. Prior to financing the purchase of the Allengrove Property, Money Warehouse obtained an

appraisal of the Allengrove Property.  (1 N.T. at 43).

128. The appraisal report describes the Allengrove Property as being "tenant" occupied.  (See

Ex. CW-2, Uniform Residential Appraisal Report, "Subject," "Occupant" column)

(emphasis added).[32]

129. On February 15, 2007, Borso and Maness executed and delivered a mortgage on the

Allengrove Property in the principal amount of $237,500.00 to Money Warehouse (herein,

"the Money Warehouse Mortgage").  (Stipulated Facts ¶19; 1 N.T. at 48, 248-249; Ex.

CW-7).

130. The Money Warehouse Mortgage secured a thirty (30)-year, Adjustable Rate Note ("Borso

---

[32]       The appraisal report valued the Allengrove Property at $250,000.00 as of January 2,
2007.  (1 N.T. at 43; Ex. CW-2).

Note") between Borso and the Money Warehouse.  (1 N.T. at 49-50; Ex. CW-6).[33]

131. Proceeds from the Money Warehouse Mortgage were used to pay, <u>inter alia</u>:

      a.  the GMAC Mortgage, which at that time totaled $151,832.68, (Ex. CW-3 at line 504);

      b.  $45,000.00 on the Fowler-D&B Mortgage, (<u>Id.</u> at line 505);[34]

      c.  $2,680.87 for 2007 Taxes to the Department of Revenue, (<u>Id.</u> at line 1501);

      d.  $732.59, $5,829.00, $17,776.49 and $203.42 to satisfy four (4) judgments entered in the Court of Common Pleas, Philadelphia County, docketed at Nos. 0607721085, 050730179, 050202334 and 070102703, respectively, (<u>Id.</u> at lines 1502 to 1505);[35]

      e.  a municipal lien of $814.13, (<u>Id.</u> at line 1506);

      f.  $373.59 for "final water/sewer to Water Revenue Dept.," (<u>Id.</u> at line 1507);

      g.  $100.00 for "Final Gas to PGW," (<u>Id.</u> at line 1508); and

      h.  $1,200.00 for "Escrow Held at 15% based on 8,000.00," (<u>Id.</u> at line 1509).

132. By deed dated February 15, 2007, Rauso, as Trustee for the Fowler Trust, granted and conveyed the Allengrove Property to Borso and Maness ("the Rauso-Borso/Maness Deed").  (Stipulated Facts ¶17; Ex. CW-5; <u>see</u> 1 N.T. at 248).  The deed states that it conveys the "same premises which Larry D. Fowler and Rhodie D. Fowler . .  conveyed unto Gennaro Rauso, Trustee for the Fowler Trust . . . [on] the 11th day of  December,

---

[33]    Maness is not a party to the Borso Note.

[34]    Although the Fowler-D&B Mortgage was for $60,000.00, Rauso (acting for D&B) agreed to accept a $45,000.00 pay off.  (<u>See</u>  2 N.T. at 47, 69-72; Ex. CW-12).

[35]    The parties have stipulated that these judgments constituted "liens and other obligations of the Fowlers which encumbered the [Allengrove] Property and which totaled approximately $29,710.09." (Ex. J-1, Stipulation of Facts ¶23).

2006." (Ex. CW-5).

133. The Plaintiffs were unaware that Rauso sold their property to Borso and Maness, that

Money Warehouse financed the purchase or that the proceeds of the Money Warehouse

had been applied as described above in Finding of Fact No. 131.

### R. The Sheriff's Sale is Cancelled; New Deed and a New Mortgage Lien Are Recorded

134. On February 27, 2007, GMAC's foreclosure counsel sent notice to the Philadelphia County

Office of Sheriff staying the sheriff's sale of the Allengrove Property that was scheduled

for March 6, 2007 due to payment of the account in full.  (Stipulated Facts ¶28).

135. On March 5, 2007, the Rauso-Borso/Maness Deed was recorded with the Philadelphia

Department of Records at document identification number 51643524.  (Id. ¶18).

136. On March 5, 2007, the Money Warehouse Mortgage was recorded with the Philadelphia

Department of Records at document identification number 5164525.  (Id. ¶20).

### S. Countrywide Purchases the Money Warehouse Mortgage

137. On February 15, 2007, Money Warehouse assigned, sold or transferred its servicing rights

under the Money Warehouse Mortgage to Countrywide.  (Stipulated Facts ¶24).[36]

138. This assignment was recorded with the Philadelphia Department of Records.  (Id. ¶25).

---

[36]     See also n. 2, supra, regarding the nature of the interest Countrywide obtained in the

Money Warehouse Mortgage.

**T.** **The Debtor Obtains Additional Legal Advice**

139. In early March 2007, the Debtor learned that Rauso had not rescinded the December 11th

Transaction as the Plaintiffs had requested. She sought additional legal advice from

Community Legal Services ("CLS"). (1 N.T. at 154).

140. Acting on CLS' advice, the Debtor executed a Revocation of Power of Attorney form,

which bears a notary stamp dated March 12, 2009, and sent it to Rauso. (1 N.T. at 155; Ex.

P-9).

**U.** **Defendants File a Complaint Seeking to Evict the Debtor from the Allengrove**
    **Property**

141. On or about March 6, 2007, Rauso, acting as "agent" for Borso, Maness and D&B filed a

landlord-tenant complaint against the Debtor in the Philadelphia Municipal Court, at LT-

07-03-06-3949, alleging nonpayment of rent in February and March 2007 and seeking

eviction. (2 N.T. at 43; Stipulated Facts ¶29; Ex. P-10).

142. Prior to receiving the landlord-tenant complaint, the Debtor had not heard of Borso or

Maness. (1 N.T. at 155).[37]

---

[37]        Included among a group of documents that was admitted into evidence at trial as part of
Rauso's Exhibit 3 is a document that purports to be a letter dated "2/16/07" from D&B to "Rhodie Fowler
and occupants" at "983 Allengrove St. Phila. Pa. 19124" concerning "notice of inspection." This

document, which purports to be signed by "James Chapis, Secretary [of D&B]," i.e., the notary who
accompanied Rauso to the Plaintiffs' residence on December 11th, predates the filing of the Landlord
Tenant Complaint. It states:

> Mrs./Ms. Fowler and all occupants,
>
> Please be advised that, in accordance with your previously signed lease with the
> Fowler Trust, we, as the property manager for the new owners David Borso and
> (continued...)

143. The Debtor attended the scheduled trial on the landlord-tenant complaint in the

Philadelphia Municipal Court.  No judgment was entered at the initial hearing  The Debtor

was advised to seek an attorney.  (1 N.T. at 156).  Her consultation with that attorney led to

the filing of her pending chapter 13 bankruptcy case.


**V.  The Debtor Files her Second Bankruptcy Case and this Adversary Proceeding**

144. On March 23, 2007, Rhodie Fowler filed a voluntary petition under chapter 13 of the

Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of

Pennsylvania, Case No. 07-11692ELF.  (Stipulated Facts ¶30; Bankr. No 07-11692,

Docket Entry No. 1).

145. On March 30, 2007, the Debtor and her husband filed a Complaint commencing this

adversary proceeding.  (Adv. Docket No. 1).

---

[37](...continued)

> Corey Maness, will be conducting a property inspection February 27, 2007 at
> 10:00 a.m.  If your schedule with not permit you to be present at said inspection,
> we will be glad to re-arrange said inspection at a time which is more convenient
> to you.
>
> Please contact us at the number above before said date; or, we will presume that
> said date and time will be accommodating to your schedule.
>
> Your attention is appreciated.

(See Ex. R-3, document bearing "page 12" in lower right hand corner).

There was no testimony at trial about this document.  Accordingly, I have no record upon which to draw any conclusions whether this letter was ever sent or received or why it was prepared. There was also no testimony concerning any property inspection being done at the Allengrove Property in late February 2007.  As such, I credit the Debtor's testimony that she had not heard of Borso and Maness until she received the landlord-tenant complaint.

W. **Other Relevant Facts**

146. Throughout the relevant time period, the Debtor lived at the Allengrove Property.
(Stipulated Facts ¶37).[38] Her possession of the Allengrove Property has been open and
exclusive.

147. Had Borso, Maness or Countrywide spoken to the Debtor prior to purchasing or obtaining a
mortgage on the Allengrove Property, they would have learned that the Plaintiffs had taken
actions to terminate the Trust Agreement and the December 11th Transaction as a whole
and that the Debtor was occupying the Allengrove Property pursuant to a claim of
ownership.

148. In financing Borso's and Maness' acquisition of the Allengrove Property, Countrywide
(and/or its assignor) did not act in bad faith towards the Plaintiffs.

## IV. CONCLUSIONS OF LAW

In their Complaint, the Plaintiffs assert four (4) claims and seek various forms of relief.

In Count I, the Plaintiffs contend that Rauso violated Section 201-7 of the UTPCPL by
failing to advise them of their right to cancel the December 11th Transaction in the manner
required by 73 Pa. Stat. Ann. §201-7 and by failing to honor the Plaintiffs' later rescission
request.

In Count II, the Plaintiffs challenge certain alleged defects in the notarization of the Trust
Agreement and Fowler-Rauso Deed pursuant to 11 U.S.C. §§ 544 and 522(h) and (g)(1).

---

[38]     The Debtor and her husband have three (3) children.  In the relevant time period, the
youngest child was approximately 16 years old and lived at home with the Debtor.  (1 N.T. at 161).

In Count III, they seek to void the December 11th Transaction with Rauso on the grounds that the Debtor's husband's did not consent to the transaction and that they terminated the transaction.

Finally, in Count IV, the Plaintiffs assert various UTPCPL claims premised, <u>inter alia</u>, on Rauso's alleged misrepresentations concerning the nature of and his intentions in offering the services that gave rise to the December 11th Transaction.

The Plaintiffs ask the court to:

1.  order the Defendants to reconvey title to the Allengrove Property to the Plaintiffs;

2.  award them statutory damages of three (3) times their actual damages, and not less than $100.00; and

3.  award them reasonable attorneys' fees and costs.[39]

I start with an analysis of the Plaintiffs' claimed right to rescind, asserted in Count I of the Complaint.

### A.    LIABILITY:   Violation of Section 201-7 of the UTPCPL

### 1.    The Statute:  Section 201-7 of Pennsylvania's Consumer Protection Law, the Right to Cancel Certain Transactions and the Enforcement of the Right to Cancel

---

[39]      I understand the Plaintiffs to have named Borso, Maness and D&B as defendants in their Complaint because the Plaintiffs sought a form of relief (the return of title to the Allengrove Property) that they believed required those Defendants' participation in this adversary proceeding.  However, I read the Complaint to state claims for damages only against Rauso.  At trial, the Plaintiffs did not introduce any evidence to establish liability on the part of Borso, Maness or D&B with respect to the damage claims asserted in the Complaint.  Accordingly, I will not mention these Defendants in the liability portion of this Opinion, except to the extent required: (1) to assess their claimed rights to retain ownership (Borso and Maness) of or a mortgage (Countrywide) against Allengrove Property and (2) to give context to my findings concerning Rauso's liability.

Section 201-7 of the UTPCPL provides that buyers who enter into certain transactions

involving the sale of goods or services resulting from the seller's contact with the buyer at the

buyer's residence are entitled to a statutory "cooling off" period during which they have a right

to cancel the transaction.  See 73 Pa. Stat. Ann. §201-7.[40]  The right to cancel applies to

---

[40]         73 Pa. Stat. Ann. §201-7 states, in pertinent part, that:

> (a) Where goods or services having a sale price of twenty-five dollars ($25) or
> more are sold or contracted to be sold to a buyer, as a result of, or in connection
> with, a contact with or call on the buyer or resident at his residence either in
> person or by telephone, that consumer may avoid the contract or sale by
> notifying, in writing, the seller within three full business days following the day
> of which the contract or sale was made and by returning or holding available for
> return to the seller, in its original condition, any merchandise received under the
> contract or sale.  Such notice of rescission shall be effective upon depositing the
> same in the United States mail or upon other service which gives the seller notice
> of rescission.

> (b) At the time of the sale or contract the buyer shall be provided with:

> > (1) A fully completed receipt or copy of any contract pertaining
> > to such sale, . . . which shows the date of the transaction and contains the
> > name and address of the seller, and in immediate proximity to the space
> > reserved in the contract for the signature of the buyer or on the front page
> > of the receipt if a contract is not used and in bold face type of a minimum
> > size of ten points, a statement in substantially the following form:

> "You, the buyer, may cancel this transaction at any time prior to midnight
> of the third business day after the date of this transaction.  See the
> attached notice of cancellation form for an explanation of this right."

> > (2) A completed form in duplicate, captioned "Notice of
> > Cancellation," which shall be attached to the contract or receipt and easily
> > detachable, and which shall contain in ten-point bold face type [certain specified
> > information] . . . .

> (c) Before furnishing copies of the "Notice of Cancellation" to the buyer, both
> copies shall be completed by entering the name of the seller, the address of
> the seller's place of business, the date of the transaction, and the date, not earlier
> than the third business day following the date of the transaction, by which the
> buyer may give notice of the cancellation.

> (d) Each buyer shall be informed at the time he signs the contract or purchases

(continued...)

44

transactions where "goods or services having a sales price of twenty-five dollars ($25) or more

are sold or contracted to be sold to a buyer, as a result of, or in connection with, a contact with or

call on the buyer . . . at his residence either in person or by telephone . . . ." Id. §201-7(a).

When §201-7 applies, the seller is required to notify the buyer at the time of sale of the

right to cancel the transaction. This must be done in three (3) ways:

1. A reference to the right to cancel must appear on the contract, or on the receipt if there is no contract, in immediate proximity to the buyer's signature line. 73 Pa. Stat. Ann. §201-7(b)(1).

2. Two copies of a "notice of cancellation" must be attached to, and easily detachable from, the contract or receipt. Id. §201-7(b)(2).[41]

---

[40](...continued)

the good or services, of his right to cancel.

(e) The cancellation period provided for in this section shall not begin to run until buyer has been informed of his right to cancel and has been provided with copies of the "Notice of Cancellation."

(f) Seller shall not misrepresent in any manner the buyer's right to cancel.

(g) Any valid notice of cancellation by a buyer shall be honored and within ten business days after the receipt of such notice, the seller shall (I) refund all payments made under the contract or sale, (ii) return any goods or property traded in, in substantially as good condition as when received by the seller; (iii) cancel and return any negotiable instrument executed by the buyer in connection with the contract or sale and take any action necessary or appropriate to terminate promptly any security interest created in the transaction.

(h) No note or other evidence of indebtedness shall be negotiated, transferred, sold or assigned by the seller to a finance company or other third party prior to midnight of the fifth business day following the day the contract was signed or the goods or services were purchased.

[41]        Both notices must use specific wording, be in at least ten-point, boldface type, and be in the language principally used in the sale presentation. Id. §201-7(b)(1), (2). Also, the seller is required to fill in the date of the transaction, the seller's name and address, and the deadline for cancellation, which is not to be earlier than the third business day following the date of the transaction. Id. §201-7(c).

(continued...)

      3.   Each buyer "shall be informed" of the right to cancel at the time the contract is signed. Id. §201-7(d).[42]

The buyer's right to cancel lasts three (3) business days.  This three (3) day period does not begin to run, however, until the "buyer has been informed of his [or her] right to cancel and has been provided with copies of the Notice of Cancellation." 73 Pa. Stat. Ann. §201-7(e).[43]

Pursuant to §201-7(b)(2), a buyer determined to cancel a sales transaction may do so by signing and returning the "Notice of Cancellation" or by giving any other "written notice" to the seller.  The seller must honor "[a]ny valid notice of cancellation" within ten (10) business days of its receipt and must not "misrepresent in any manner the buyer's right to cancel." Id. §201-7(g), (d).

The seller must honor the buyer's notice of cancellation by (1) refunding "all payments made under the contract or sale," (2) returning "any goods or property traded in, in substantially as good condition as when received by the seller" and (3) cancelling and returning "any negotiable instrument executed by the buyer in connection with the contract or sale and tak[ing] any action necessary or appropriate to terminate promptly any security interest created in the transaction." Id. §201-7(g).

---

[41](...continued)

[42]     Presumably, the seller must orally inform the buyer(s) of the right to cancel.  Irv Ackelsberg, et. al, Pennsylvania Consumer Law 137-138 (Carolyn L. Carter ed., George T. Bissel Co., Inc. 2d ed. 2003 & 2009 Suppl.).

[43]     The buyer may waive the right to cancel, but only if the goods or services are needed to meet "a bona fide immediate personal emergency" of the buyer and the buyer makes a handwritten, signed personal statement describing the situation and expressly waiving the right to cancel. Id. §201-7(j).  No party in this proceeding has asserted that the "bona fide personal emergency" exception is applicable or that the Plaintiffs' expressly waived their rights to cancel.

2.    **Section 201-7 Applies to the December 11th Transaction Between the Plaintiffs and Rauso**

Plaintiffs contend that their December 11th Transaction with Rauso meets all of the elements necessary for it to fall within the purview of §201-7 of the UTPCPL.

Rauso, on the other hand, contests the applicability of §201-7 on three (3) grounds. First, he argues that the Plaintiffs do not qualify for protection under §201-7 because they were the sellers, and not the buyers, in the December 11th Transaction. See, e.g., DeFazio v. Gregory, 836 A.2d 935 (Pa. Super. Ct. 2003) (§201-7 protects only buyers of goods and services and not persons who performed solely as sellers). Second, he contends that the Plaintiffs have failed to prove that the December 11th Transaction had a sales value of $25.00 or more. Third, he contends that the Plaintiffs' claims are barred by the "gist of the action" doctrine.

I will examine each of Rauso's contentions in turn.

### a. the Plaintiffs were the buyers in the sales transaction Rauso devised

Rauso contends that the evidence "revealed a real estate transaction in which the Fowlers sold Rauso, as trustee, the [Allengrove Property] with the condition they would have the first right to re-purchase the property at a later date." (Defs. Rauso/D&B Post Trial Mem. at 11 (emphasis added)). Rauso argues that evidence that he, and not the Plaintiffs, was the "buyer" in the December 11th Transaction is fatal to the Plaintiffs' claim that §201-7 applies. I disagree.

The evidence conclusively establishes that the Debtor and her husband were "buyers" for the purposes of §201-7. They dealt with Rauso as "buyers" interested in "purchasing" Rauso's "services" – i.e., his assistance in avoiding foreclosure on and permanent loss of the Allengrove

47

Property.   A number of considerations support this conclusion.

First, from the very outset of this transaction, Rauso marketed himself to the Plaintiffs, not as an ordinary home buyer, but as person possessed of certain unique training, contacts and information that would make him and his services valuable to homeowners interested in avoiding foreclosure.[44]   He told the Debtor that he had been in her position before, that he had been specially trained on how to stop foreclosures, that he had helped others in her position keep (not sell) the properties and that he could help the Plaintiffs too.

Second, the evidence establishes that, in entering the transaction with Rauso, the Plaintiffs never had the slightest interest in selling the Allengrove Property.  Indeed, the Debtor responded to Rauso's solicitation letter for the opposite reason  – to prevent a transfer of the property.   The structure of the December 11th Transaction was entirely Rauso's creation, presented to the Debtor as a means of avoiding foreclosure on, and permanent loss of, the Plaintiffs' property.  The Debtor was convinced to enter into the transaction only after Rauso pitched the idea that the temporary transfer of title to the Allengrove Property to him would help the Plaintiffs avoid foreclosure and keep the property in the long term.

Additionally, when Rauso prepared and presented the maze of documents that papered

_____

[44]        For example, in his November 2nd Letter, he told the Plaintiffs that he was uniquely positioned to advise them about a "number of options" they had available to them to avoid foreclosure on the Allengrove Property.  (Ex. P-1).  Rauso advertised that by working with him, the Plaintiffs could gain access to "a number" of his "contacts that [would] help [them] get refinanced, where others may not have been able to do so regardless of [their] credit score."  (Id.)  He also told them that if they had an FHA loan, he knew of a number of programs that they might be eligible for that would allow them to cure the entire default on their mortgage.  Only if these potential solutions proved ineffective, did Rauso suggest that he could help the Plaintiffs by "buying" their property, subject to all of its liens and encumbrances, permitting them to buy it back from him at a later date.  See Finding of Fact No. 22.  When he visited the Debtor's home on December 11th, constructed the transaction to provide for the transfer of the Allengrove Property without exhausting any of the alternatives described in the November 2d Letter.

the December 11th Transaction, he assigned himself and the companies he owned or controlled a

variety of roles that are not consistent with those typically associated with the ordinary real

estate buyer.  For example, he created a "Fowler Trust" via the Trust Agreement in which he

appointed himself Trustee, with the Plaintiffs (the purported "sellers") as beneficiaries.  See Part

III. K.1, supra.  He solicited the Debtor to sign a document granting him broad power of attorney

rights, ostensibly so he could negotiate with the Plaintiffs' mortgage company on their behalf.

See III. K. 5, supra.  He appointed Defendant D&B, a company he owned and/or controlled,

"property manager" of the Allengrove Property and set the terms of a lease of that property to

the Plaintiffs.  See Part III. K.7, supra; Ex. R-14.

     That the transaction between the parties is not most aptly characterized as a sale of the

Allengrove Property is further evidenced by the fact that Rauso never paid anything to the

Plaintiffs in consideration for obtaining title to the Allengrove Property.  See Part III. K.2

(Finding of Fact No. 59); Ex. R-9.  On the other hand, the record is rife with "payment" or the

transfer of things of value Rauso caused the Plaintiffs to convey or assign to him and/or

corporations he owned and controlled in connection with the December 11th transaction.[45]

     In my view, the evidence is overwhelming in support of the conclusion that the

December 11th Transaction is best characterized one in which the Debtor and her husband were

the "buyers," purchasing Rauso's services to prevent the looming sheriff's sale of the Allengrove

Property.  Rauso convinced the Plaintiffs that he was going to intervene and prevent the

---

    [45]    (See, e.g., Trust Agreement (Ex. P-2; Ex. R-12) (providing Rauso with compensation of
$25.00 an hour for services rendered for the Trust and a lien on Trust Property for unpaid compensation);
Beneficiary Assignment (Ex. P-6; latter part of Ex. R-14) (assigning all of Plaintiffs' interests as the
Beneficiary in the Trust Agreement to REO, a company owned and controlled by Rauso); Fowler-D&B
Mortgage (purporting to grant D&B, an entity owned and controlled by Rauso, a $60,000.00 mortgage on
the Allengrove Property despite the lack of an underlying loan or indebtedness to D&B).

foreclosure.  (See, e.g., 1 N.T. at  217-220).

Accordingly, for the purposes of §201-7 of the UTPCPL, I conclude that the Plaintiffs

were "buyers" of Rauso's foreclosure intervention and prevention services.  See generally Byrd

v. Jackson, 902 A.2d 778 (D.C. Cir. 2006) (affirming finding that, for the purposes of the District

of Columbia's Consumer Protection Procedures Act, plaintiff was a purchaser, and not the seller

of her home where defendant presented himself as a "'foreclosure specialist' who would aid her

in keeping her home," sent plaintiff advertisement stating that defendant's business was to help

people keep the properties, initially assisted homeowner in filing bankruptcy petition to enable

her to work out payment plan with mortgage company and where plaintiff did not intend

permanent loss or sale of her home).


### b.  the $25.00 statutory threshold is satisfied

Next, Rauso contends that §201-7 does not apply to his December 11th transaction with

the Plaintiffs because the evidence does not establish that the transaction had a sales price of

$25.00 or more.  (See Def. Rauso/D&B's Post-Trial Mem. of Law, at 11).  Given my findings

concerning the compensation the Plaintiffs promised to pay to Rauso as Trustee (i.e., $25.00 an

hour), I reject this argument.[46]

---

[46]     I also point out that, at Rauso's behest, the Plaintiffs granted a $60,000.00 mortgage to
D&B, an entity controlled by Rauso.  Because the modest threshold of 73 Pa. Stat. Ann. §201-7 is met by
the promise to pay $25.00 per hour and the virtual certainty that the nature of the services promised by
Rauso would require the expenditure of more than one (1) hour of his time, I need not decide whether the
consideration to Defendant D&B is attributable to Rauso for purposes of the $25.00 statutory threshold.

### c.   the "gist of the action" doctrine does not bar the Plaintiffs' claim

Finally, Rauso argues that the "gist of the action" doctrine bars the Plaintiffs's §201-7 claim.  (Rauso/D&B's Post-Trial Mem. of Law, at 8-9).  Generally speaking, he accuses the Plaintiffs of "recasting" a breach of contract claim into UTPCPL terms.

The "gist of the action" doctrine, sometimes known as the "economic loss doctrine,"[47] originates from the principle that contract remedies should be distinguished from tort remedies. The doctrine is designed to preclude plaintiffs "from re-casting ordinary breach of contract claims into tort claims."  eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  The purpose of the doctrine is to avoid the perceived harm that would result from permitting "a promisee to sue his promisor in tort for breaches of contract inter se [thereby] erod[ing] the usual rules of contractual recovery and inject[ing] confusion into our well-settled forms of actions."  Id.  The doctrine bars tort claims where the "gist" of the underlying claim sounds in contract rather than tort.  Id. at 14-15.[48]

One means of determining whether the asserted claim sounds in tort or contract is to

---

[47]      I will use the terms interchangeably.

[48]      Our Court of Appeals predicted that the Pennsylvania Supreme Court would recognize the applicability of the gist of the action doctrine to statutory claims filed under the UTPCPL.  See Werwinski v. Ford Motor Co., 286 F.3d 661, 681 (3d Cir. 2002).  Perhaps so, although it appears the Pennsylvania legislature has purposely overridden the doctrine to provide a UTPCPL remedy for at least certain contractual claims.  See 73 Pa. Stat. Ann. §201-2(4)(xiv) (defining unfair trade practice as including "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer"); see generally Clark v. EMC Mortg. Co., 2009 WL 229761, at *6 (E.D. Pa. Jan. 29, 2009) (declining to apply "gist of the action" doctrine to UTPCPL claims) (per Rufe, J.); O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 275-78 (E.D. Pa. 2003) (predicting economic loss doctrine will not be held applicable to UTPCPL claims) (per Van Antwerpen, J.).

        In this case, I need not decide the broad legal question whether the "gist of the action" doctrine may be applied to all UTPCPL claims.  As explained in the text infra, the doctrine does not apply to the particular UTPCPL claim raised by the Plaintiffs under 73 Pa. Stat. Ann. §201-7.

identify the source of the underlying duties that the defendant is alleged to have violated.  "The

important difference between contract and tort actions is that the latter lie from the breach of

duties imposed as a matter of social policy while the former lie for the breach of duties imposed

by mutual consensus."  <u>Clark</u>, 2009 WL 229761, at *3.  Pursuant to the "gist of the action"

doctrine, "if the source of the duty that [the plaintiff contends] was breached arose from the

parties' agreements rather than social policy, the plaintiff is limited to a contract claim."  <u>De</u>

<u>Lage Landen Fin. Serv., Inc. v. Barton Nelson, Inc.</u>, 2008 WL 4791891, at *6 n.11 (E.D. Pa.

Nov. 4, 2008) (citing <u>Owen v. J. Roberts Sch. Dist. v. HTE, Inc.</u>, 2003 WL 735098, at *2 (E.D.

Pa. Feb. 28, 2003)).

Here, Rauso contends that, through their UTPCPL claim, the Plaintiffs are attempting to

"recast" their "confusion" concerning the import of the contracts the Debtor signed into a fraud

claim.  (Rauso/D&B's Post-Trial Mem. of Law, at 9).  He argues that the "gist of the action"

doctrine bars that attempt.

I disagree with Rauso's characterization of the Plaintiff's UTPCPL claim.

The issues the Plaintiffs raise with respect to their §201-7 claim do <u>not</u> recast or duplicate

the elements of a breach of contract claim.  The "gist" of the Plaintiffs claim is not that Rauso

failed to abide by his contractual promises, but rather that he failed to comply with his <u>statutory</u>

obligation to disclose the Plaintiffs' right to cancel the December 11th Transaction.  That legal

duty was not derived from the various contracts entered into that day, rather, it was imposed on

Rauso solely by law:  the UTPCPL.  Accordingly, the "gist" of the Plaintiffs' claim for violation

of 73 Pa. Stat. Ann. §201-7 does not sound in contract.

52

### d.  summary

In sum, I conclude none of Rauso's defenses to the Plaintiff's §201-7 claim have merit

and that the Plaintiffs are entitled to the protections of §201-7 with respect to their December

11th Transaction with Rauso.

More specifically, in addition to finding that the transaction was one in which the

Plaintiffs were the "buyers" of services with a sales price of $25.00 or more, I find that the

transaction between Rauso and the Plaintiffs was made "as a result of, or in connection with, a

contact with or call on the buyer or resident at his residence."  73 Pa. Stat .Ann. §201-7(a).

Rauso solicited the Plaintiffs at their home.  The transaction was the result of Rauso's repeated

contacts with the Plaintiffs' home, starting with the "door opener" he mailed to the Plaintiffs

inviting them to do business with him, and including telephone calls he initiated to the Plaintiffs'

residence.  The transactional documents were signed in the Plaintiffs' home.  Additionally,

Rauso visited the Plaintiffs' home, not as the result of some pre-existing social relationship

between the Debtor and Rauso, but for the purposes of closing the deal with the Plaintiffs and

obtaining an original of the power of attorney that the Debtor had for her husband (a document

required to close the transaction).  Cf. Lou Botti Constr. v. Harbulak, 760 A.2d 896 (Pa. Super.

Ct. 2000) (finding that §201-7 did not apply to transaction between contractor and homeowner

where visits to plaintiff's residence were made, not in connection with gaining the plaintiff's

business, but from pre-existing personal relationship).


### 3.  Rauso Violated Section 201-7

Having found that §201-7 applies to the transaction between the Plaintiffs and Rauso, it

follows that the Rauso was required to comply with that section's notice of cancellation

requirements at the time of sale.

Rauso did not comply with §201-7.  None of the documents he presented to the Debtor

on December 11th contained a "Notice of Cancellation" as required by §201-7.  Additionally,

Rauso did not orally advise the Plaintiffs that they had a right to cancel.  Thus, pursuant to §201-

7(e), the Plaintiffs' three (3) day right to rescind never commenced and did not expire before the

Plaintiffs exercised that right.

Also, Rauso violated §201-7(f), which requires that a seller "not misrepresent in any

manner the buyer's right to cancel" when he told the Debtor that she had no right to cancel the

December 11th Transaction.

All of these acts or failures to act violated §201-7 of the UPTCPL  See generally Burke v.

Yingling, 666 A.2d 288 (Pa. Super. Ct. 1995).


**4. Rauso's Violation of Section 201-7 of the UTPCPL Entitles the Plaintiffs to Remedies Under Section 201-9.2**

The Plaintiffs here seek equitable relief (to effect restoration of their title to the

Allengrove Property) or, in the alternative, monetary damages.  They also seek an award of

reasonable attorneys' fees and costs.

The UTPCPL provides a private right of action as follows:

**§201-9.2.  Private actions**

(a)  Any person who purchases or leases goods or services primarily for
personal, family, or household purposes and thereby suffers any
ascertainable personal, as a result of the use or employment by any person
of a method, act or practice declared unlawful by section 3 of this act, may
bring a private action to recover actual damages or one hundred ($100)

> dollars, whichever is greater.  The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper.  The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 Pa. Stat. Ann. §201-9.2.

Case law under §201-7 holds that violations of that provision may be remedied through §201-9.2.  See Culbreth v. Lawrence J. Miller, Inc., 477 A.2d 491, 500-01 (Pa. Super. Ct. 1984);[49] see also Christopher v. First Mut. Corp., 2008 WL 1815300, at *12 (E.D. Pa. Apr. 22, 2008) ("[v]iolations of §201-7 can be remedied through UTPCPL §201-9.2").  No party in this litigation has argued otherwise.  Rather, in contesting the Plaintiffs' claim for equitable relief, the Defendants either disputed the merits of the asserted §201-7 violation (Rauso's defense) or, as discussed in detail below, asserted that the violation may not be remedied by restoring the

---

[49]     The Culbreth court reasoned that a required element of an action under §201-9.2 is that the damages that the plaintiff seeks to remedy resulted from "an act or practice that violates section 3 of the statute," i.e., 73 Pa. Stat. Ann. 201-3.  It concluded, as a matter of law that violation of §201-7 satisfies that requirement, reasoning as follows:

> Section 2(4) of the Consumer Protection Law defines "unfair methods of competition" and "unfair or deceptive acts or practices." Sixteen different acts or practices are enumerated, and then a seventeenth, which is defined as: "Engaging
>
> in any other fraudulent conduct which creates a likelihood of confusion or misunderstanding." Section 2(4) (xvii). Section 3 of the Consumer Protection Law provides that the practices defined in section 2(4) and in the regulations promulgated under section 3.1 are unlawful. . . . [C]onduct  in violation of section 7 is within section 2(4)(xvii), and therefore within section 3, as "fraudulent conduct which creates a likelihood of confusion or misunderstanding."

Culbreth, 477 A.2d at 500-01 (emphasis added).

55

Plaintiffs' title to the Allengrove Property (Borso, Maness and Countrywide's defense).

Having concluded that the Plaintiffs are entitled to relief for their §201-7 UTPCPL claim, I next determine what remedies should be granted.

## B.  REMEDIES

### 1.  Restored Title to the Allengrove Property

As one remedy for Rauso's violation of the UTPCPL, Plaintiffs seek an order that restores their title to the Allengrove Property and that nullifies the title of any purchaser or mortgagee that occupied a position downstream from Rauso, as Trustee for the Fowler Trust. While Rauso's violation of §201-7 ordinarily would entitle the Plaintiffs to the right to rescind their entire transaction with him (including the transfer of title) if title to the Allengrove Property remained in the name of his entity, the subsequent sale of the property to Maness and Borso, and the creation of a mortgage in favor of Countrywide's assignor (Money Warehouse), complicates things considerably.

As a result of Rauso's violation of §201-7, he obtained title that was voidable (as opposed to void <u>ab initio</u>).  <u>See generally</u>, <u>Kepler v. Kepler</u>, 199 A. 198, 202  (Pa. 1938) (where grantor has been induced by fraud to transfer title to real property, grantee obtains voidable title); <u>Puharic v. Novy</u>, 176 A. 233, 234 (Pa. 1934) (same).  Under Pennsylvania law, bona fide purchasers for value without notice of the property claims of third parties may hold title free and

clear of any intermediate fraud by a grantee holding voidable title.[50]

Defendants Borso, Maness and Countrywide (when referred to collectively herein, the "Downstream Title Defendants") contest Plaintiffs' right to regain title on precisely that ground.[51]  These defendants claim to be subsequent, good faith, bona fide purchasers/mortgagees for value without notice of the Plaintiffs' claims to ownership of the Allengrove Property ("the BFP Defense").  They contend that under Pennsylvania law, they may retain their title (or, in

---

[50]    See, e.g., Kepler, 199 A. at 202 (where grantor has been induced by fraud to transfer title to real property, grantee obtains voidable title and innocent purchaser for value is not "bound by secret liens or equities even though the . . . title was obtained by fraud"); Haggerty v. Moyerman, 184 A. 654, 656 (Pa. 1936) ("A purchaser of land who pays value for it, or a mortgagee who lends money upon the security of the title of a mortgagor, and who has neither actual nor constructive knowledge of any claims of third parties, holds the title or lien so acquired free of any such secret equities."); Puharic, 176 A. at 234 ("A mortgagee of land who gives the consideration called for in the mortgage to the mortgagor, and has no knowledge of secret liens or equities in third persons, will hold his mortgage lien free and clear of such liens or equities").


[51]    Borso and Maness did not file a response to the Plaintiffs' Complaint or any memoranda of law and proceeded pro se, which makes their positions a little difficult to ascertain.  However, neither Borso nor Maness consented to having his title to the Allengrove Property deemed null and void.  In the inserts they provided to Countrywide for inclusion in the Pretrial Statement, they contended that they "purchased the Property in good faith" (Adv. Docket Entry No. 39, at 9 (B.1)) and stated that they joined Countrywide in requesting that the court enter an Order declaring that the Plaintiffs have no right, title or interest in the Property (Adv. Docket Entry No. 39, at 10.9).  As such, I find that Borso and Maness sufficiently raised the bona fide purchaser for value defense and preserved their objection to the Plaintiffs' requested relief.

In so finding, I am aware that, at trial, when Maness was asked whether he had any objection to the Plaintiffs' "getting their property back", he said that he did not, so long as Countrywide released him and Borso from their obligation on the mortgage and/or note and the Plaintiffs could get and sustain a mortgage in their own names.  (1 N.T. at 259).  I do not find that this apparent conditional consent to the transfer of title to the Plaintiffs to constitute an abandonment of the prior opposition to that relief, particularly where the conditions have not been satisfied (i.e., Countrywide has not agreed to release Borso or Maness or substitute the Plaintiffs for them).

Countrywide's case, its mortgage lien) regardless whether Rauso obtained his title by fraud.

### a.   void ab initio vs. voidable title

Before undertaking an analysis of the Defendants' BFP Defense in the context of Rauso's §201-7 violation, I must digress briefly.

The Plaintiffs asserted several claims that they contend render Rauso's title to the Allengrove Property void ab initio as opposed to voidable.  If the Plaintiffs were correct, there would be no need to analyze the BFP Defense.  If Rauso obtained void title, he had no title to pass on to the Downstream Title Defendants.  See generally, Harris v. Harris, 239 A.2d 783, 784-85 (Pa. 1968) (transfer based on forged deed cannot pass title, even to a good faith purchaser); accord Bennerson v. Small, 842 F.2d 710, 714 (3d Cir. 1988).  As a result, I consider those claims first.

In assessing the Plaintiffs' other claims, however, I conclude that either: (1) they lack merit or (2) they would have render Rauso's title merely voidable (and not void), if proven.  Accordingly the Downstream Title Defendants' BFP Defense must be considered.

The Plaintiffs' first such "voidness" claim is in Count II of their Complaint.  There, the Plaintiffs challenge the sufficiency of the notarization on the Trust Agreement and the Fowler-Rauso Deed on the grounds that:  (1) the notary public, Mr. Chapis, was from Delaware County and not Philadelphia County, where the Allengrove Property is located and (2) the acknowledgment for the Trust Agreement and Fowler-Rauso Deed states that these two documents were executed in Delaware County when they were actually executed in Philadelphia

County.  The Plaintiffs assert these two challenges to the notarization of these documents

pursuant to 11 U.S.C. §544 and §522(h) and (g)(1).

The allegations raised in Count II of their Complaint, if proven, would not render

Rauso's title void.  Under Pennsylvania law, notaries have the authority to perform their duties

on a statewide level.  Accordingly, that the notary public is from a different county than the

county where the lands being conveyed lie is not grounds for invalidating an otherwise proper

deed.  See, e.g., Davey v. Ruffell, 29 A. 894 (Pa. 1894); see also In re Jones, 308 B.R. 223 (E.D.

Pa. 2003); In re Wagner, 353 B.R. 106, 118 (Bankr. W.D. Pa. 2006) ("Pennsylvania notaries

continue to possess jurisdiction and authority to perform their duties on a statewide level").

Similarly, the erroneous reference in the acknowledgments to the Trust Agreement and Fowler-

Rauso Deed that these documents have been executed in Delaware County also is not the sort of

defect that would void an otherwise valid conveyance.  See, e.g., Angier v. Schieffelin, 72 Pa.

106 (Pa. 1871); see also Wagner, 353 B.R. at 116 (because notary's failure to date the

acknowledgment does not undermine the purpose of the acknowledgment  – "verify[ing] that the

signed document is the intentional and voluntary act or deed of the signing party – such failure

does not render the document void).

At trial, the Plaintiffs expanded the challenges they asserted in Count II of their

Complaint to include a challenge to certain interlineations that appear on the acknowledgment

page of the Fowler-Rauso Deed and the Trust Agreement.  Specifically, it appears that the typed

acknowledgment page had at one time erroneously stated that the Debtor's husband, who was

incarcerated, appeared "personally" before the notary.  When this error was discovered, a

handwritten interlineation was made to note that the Debtor's husband appeared through his

wife, who had his power of attorney.  The parties dispute whether this interlineation was made in

the Debtor's presence or outside the Debtor's presence and prior to recording.  I need not resolve

that dispute because I find that the Debtor did execute these two documents on both her own

behalf and her husband's, and that the notary witnessed her signature.  In these circumstances,

the correction of the acknowledgments would appear to fall within those category of correctable

defects that do not rise to such level that they would void the deed or Trust Agreement.  See,

e.g., Angier, 72 Pa. 106; Wagner, 35 B.R. at 116-17.

Next, in Count III of their Complaint, the Plaintiffs assert that their transaction with

Rauso is null and void (and that, in effect, he obtained no title) because the Debtor's husband did

not consent to the December 11th Transaction.  I also find that this claim lacks merit.  The

Debtor's husband provided her with a power of attorney that contained a very broad grant of

authority that would encompass the actions she took in entering into the December 11th

Transaction.[52]  Mr. Fowler did not testify at the trial and no evidence was introduced to suggest

that the Debtor acted outside the boundaries of the power of attorney he granted to her.  Indeed,

the Debtor's testimony concerning the nature of the telephone conversations she had with her

husband leads me to conclude that Mr. Fowler authorized the Debtor to enter into the transaction

---

[52]     Specifically, by its terms, the power of attorney provided the Debtor with the power to
"exercise or perform any act, power, duty, right or obligation whatsoever that [the Debtor's husband] now
[has], or may hereafter acquire . . . in connection with, arising from, or relating to the Property, property
and real estate located at 983 Allengrove Road, Philadelphia, PA 19124."  (Ex. R-11 ¶1).  It further
provided that such "rights, powers, and authority shall remain in full force and effect . . . until such time
as [the Debtor's husband] is released from incarceration, or terminated prior to [his] release from
incarceration by written notice signed by [him]."  (Id. ¶8).

with Rauso provided she found the details acceptable.

Also in Count III, the Plaintiffs contend that they terminated the Trust Agreement within the 30-day cancellation period provided and did so prior to Rauso's having entered into an agreement to sell the Allengrove Property.  They imply that this fact renders Rauso's title void.  However, the Plaintiffs' argument ignores the fact that, by signing the Beneficiary Assignment, the Debtor immediately assigned the right to terminate the Trust Agreement to REO, a company controlled by Rauso.  Accordingly, at the time the Plaintiffs attempted to exercise the contractual right to terminate, they apparently no longer possessed that right.  They also do not offer any legal authority that would suggest that the termination of the Trust Agreement, after the initial transfer of the property, rendered the Fowler Trust's title void rather than voidable.

Finally, in Count IV, the Plaintiffs asserted a "general" UTPCPL claim, a claim that is a statutory analogue to a common law fraud claim.  If successful, such a claim, like the §201-7 claim, this claim would render title voidable, rather than void.  See generally Puharic, 176 A. at 234 (a deed procured by fraud is ordinarily merely voidable); Empire Fire & Marine Ins. Co. v. Banc Auto, Inc., 897 A.2d 1247, 1250 (Pa. Super. Ct. 2006) (title to goods obtained by fraud is voidable while title obtained from goods obtained by theft or from thief is void); In re Estate of Long, 615 A.2d 421, 422 (Pa. Super. Ct. 1992) ("[u]nder general contract principles, however, a material misrepresentation renders a contract voidable not void").

Having rejected the Plaintiffs' claims that Rauso's title was void and not merely voidable, I next address the Downstream Defendants' BFP Defense.

### b.  Pennsylvania Law on Bona Fide Purchasers for Value Without Notice

Pennsylvania law protects subsequent purchasers of real property from prior, unrecorded

interests only if the subsequent purchaser took the property for value and without notice of any

defect in title.  See, e.g., Ingomar Ltd. P'ship v. Current, 2008 WL 660099, at *6 (M.D. Pa. Mar.

6, 2008); see also Roberts v. Estate of Pursley, 718 A.2d 837, 841 (Pa. Super. Ct. 1998); Long

John Silver's, Inc. v. Fiore, 386 A.2d 569, 573 (Pa. Super. Ct. 1978).  A bona fide purchaser, or

bona fide mortgagee (as the case may be) is insulated from the claims or interest of third parties.

A bona fide purchaser obtains title that is essentially purged of  the fraud of his or her

predecessors in interest.  See Puharic, 176 A. at 233 ("a purchaser of land who pays value for it

and has no knowledge, express or implied, of the existence of any equities in third parties, holds

the title so purchased, free and clear of secret liens or equities"); In re Lauver, 372 B.R. 751, 760

(Bankr. W.D. Pa. 2007) (under Pennsylvania law, "a purchaser of real property without actual or

constructive notice of a third party's claims with respect to the property takes it free of the claim

of that party").

There is no dispute in this case that the Downstream Title Defendants provided

consideration (or "value") in connection with the purchase of the Allengrove Property and the

financing of that purchase.  The issue warranting further examination is whether the Downstream

Title Defendants were "without notice" of the Plaintiffs' competing claim to title to the

Allengrove Property.

### c.  The Downstream Title Defendants' Notice of the Plaintiffs' Unrecorded,

**Equitable Claim to Ownership of the Allengrove Property**

Following their transaction with Rauso, the Plaintiffs' claim to ownership of the

Allengrove Property was <u>unrecorded</u>.  Record title to the Allengrove Property rested in Rauso's

name, as Trustee for the Fowler Trust.  However,

> [i]t is well settled that purchasers and mortgagees of real estate are affected
> not only by matters of which they had actual knowledge and by what appeared
> in the office of the recorder of deeds and in the various courts of record whose
> territorial jurisdiction embraced the land in dispute, <u>but as well by what they
> could have learned by inquiry of the person in possession and of others who,
> they had reason to believe, knew of facts which might affect the title.</u>

<u>Sidle v. Kaufman</u>, 29 A.2d 77, 82 (Pa. 1942) (emphasis added) (internal quotations omitted).

As one court explained:

> A purchaser of real property must exercise ordinary diligence to qualify as a
> bona fide purchaser.  <u>Knowledge of every fact which "the exercise of ordinary
> diligence would have put him in possession" is imputed to that purchaser.</u>
>
> Constructive knowledge . . . consists of what a purchaser . . . would have
> discovered from inspecting the public record in the office of the recorder of the
> deeds <u>as well as from inquiring of the person in possession of the property or
> anyone else the purchaser has reason to believe has knowledge of facts which
> might affect title to the property.</u>

<u>Lauver</u>, 372 B.R. at 760 (emphasis added); <u>see also</u> <u>Ingomar</u>, 2008 WL 660099, at *6.

In this case, the evidence establishes that Maness, Borso and Countrywide (through its

assignor, Money Warehouse)[53] were on notice of the certain facts and circumstances derived

from the publicly-recorded documents within the chain of title or from documents their title

---

[53]        "The rule [in Pennsylvania] is that the assignee of a mortgage takes it subject to all
defenses available against the assignor and that the recording acts in no way give the assignee a better
right than the assignor." <u>Kepler</u>, 199 A. at  203.

agent[54] reviewed:

1.  the Plaintiffs held title to the Allengrove Property before Rauso did, (see Ex. CW-4 (Title Insurance Commitment, at 1, 7));[55]

2.  the Plaintiffs transferred title to Rauso not personally, but as Trustee of the Fowler Trust, (see Ex. CW-4 (Title Insurance Commitment, at 1), Exs. P-2 & R-12 (Trust Agreement));[56]

3.  that Rauso's authority to transfer title to the Allengrove Property was governed by a Trust Agreement, (see Exs. P-2 & R-12 (Trust Agreement); Exs. P-3, CW-4, at 1 & R-13 (Fowler-Rauso Deed));[57]

4.  the Trust Agreement provided Rauso with the authority to sell the Allengrove Property only as directed by the "Beneficiary," a term that is defined in the Trust

---

[54]    Borso and Maness and Countrywide's assignor retained DiGiacomo as the title agent for the closing on the Allengrove Property acquisition.  It was his responsibility to determine whether title could be insured so that a title insurance policy could be provided to the buyers and mortgagee.  Part of this role involved ordering that the chain of title to the Allengrove Property be researched and analyzing those results to determine whether First American's exceptions and requirements to insurable title could be satisfied so that a title policy could be provided.

Principles of agency dictate that the knowledge DiGiacomo gained as agent for the Downstream Title Defendants be imputed to his principals.  See Ingomar, 2008 WL 660099, at *6 n.11 (title agent's research imputed to buyers); see also In re Color Tile Inc., 475 F.3d 508, 513 (3d Cir. 2007) ("Where an agent receives notice, that notice is imputed to the principal").

[55]    That the Plaintiffs were the prior record titleholders to the Allengrove Property was revealed by the recorded documents within the chain of title for the property.

[56]    That the Plaintiffs transferred title to Rauso as Trustee for the Fowler Trust is made plain in the recital language in the Fowler-Rauso Deed, (see, e.g. Ex. P-3), a publicly-recorded document within the chain of title.

[57]    Pages one (1) and two (2) of the Fowler-Rauso Deed (Ex. P-3), which was publicly recorded and within the chain of title, say that the Plaintiffs granted the Allengrove Property to the Trustee for Fowler Trust "under the provisions of a trust agreement dated the 11th day of December 2006, known as Trust Number 983" and that Rauso, the Trustee, was to "have and hold the said premises in fee simple forever . . . for the uses and purposes . . . in said Trust Agreement."  (Ex. P-3, at 1, 2).

Agreement to mean the Plaintiffs, (Ex. R-12);[58]

5.  the Trust Agreement provided the "Beneficiary," defined in the Trust Agreement
to mean the Plaintiffs, with a 30-day right to terminate the Trust Agreement, (Exs.
P-2 & R-12); and

6.  distinct from the right to terminate the Trust Agreement, the Plaintiffs had been
granted the first right to re-purchase the Allengrove Property from Rauso with
that right negated only if the Plaintiffs breached the terms of a lease agreement
they had with Defendant D&B, (Ex. R-12 ¶4).[59]

---

[58]    The Trust Agreement was not recorded with the Philadelphia Department of Records.
However, it is referenced in the recorded Fowler-Rauso Deed and the First American Title Insurance
Company required that a copy of the Trust Agreement be provided to it before it would insure title.  (See
CW-4, at 3).  DiGiacomo received and reviewed the Trust Agreement in his role as title agent for the
Downstream Title Defendants.

No evidence was produced at trial to suggest that DiGiacomo or any of the Downstream
Title Defendant had notice of the Beneficiary Assignment, pursuant to which the Plaintiffs assigned
certain of their rights under the Trust Agreement to REO, a company owned and controlled by Rauso.
DiGiacomo testified that he satisfied himself that Rauso had the authority to transfer title and that the

trust was still in existence and had not been terminated or revoked by his review of the Trust Agreement
alone.

[59]    The Buy Back Clause is included within the Trust Agreement (Ex. R-12, ¶4).

I acknowledge that Dr. DiGiacomo testified that, at the time he was performing his duties
as title agent, he did not know that the Trust Agreement contained a provision that granted the Plaintiffs
priority rights to re-purchase the Allengrove Property.  However, DiGiacomo acknowledged that he was
provided with a copy of the Trust Agreement and reviewed it to satisfy certain conditions precedent to the
issuance of a title insurance policy.  The Buy Back Clause is in the Trust Agreement, included within a
paragraph titled, "Powers and Duties of the Trustee."   Principles of agency dictate that the Downstream
Title Defendants be charged with notice of this clause that was provided to their agent.  See, e.g.,
Ingomar, 2008 WL 66099, at *6 n.11 (title agent's research and/or failure to research imputed to buyers).

I note further DiGiacomo testified that he considered ascertaining whether Rauso, as
Trustee for the Fowler Trust, had the authority to transfer title to the Allengrove Property key to his
determination whether First American could or should insure title.  (1 N.T. at 105).

<u>Second</u>, throughout the relevant time period, the Debtor maintained clear, open and exclusive possession of the Allengrove Property.  As our Court of Appeals observed in reviewing Pennsylvania law:

> in Pennsylvania, clear and open possession of real property generally constitutes <u>constructive notice to subsequent purchasers of the rights of the party in possession.</u> <u>Such possession, even in the absence of recording, obliges any prospective subsequent purchaser to inquire into the possessor's claimed interests, equitable or legal, in that property.</u>

<u>McCannon v. Marston</u>, 679 F.2d 13, 16 (3d Cir. 1982) (emphasis added) (citing <u>Klinch v. Fluke</u>, 166 A. 905 (Pa. 1933)); <u>see also</u> <u>Long John Silver's, Inc.</u>, 386 A.2d at 573.

Consistent with our Court of Appeals' observation, a long line of Pennsylvania courts have held that, as part of the duty to exercise ordinary diligence in the purchasing process, a buyer of real property <u>is obliged to ask those in physical possession of property</u> (who are not also the current record titleholders) if they have some title to, or interest in, the occupied property that is adverse to the prospective buyer's title.[60]  Pennsylvania imposes the same duty of inquiry on a

---

[60]    See, e.g., <u>Malamed v. Sedelsky</u>, 80 A.2d 853, 855 (Pa. 1951) ("it has long been settled that it is the duty of a purchaser of real property to make inquiry respecting the rights of the party in possession and failing to do so[,] they are affected with constructive notice of such facts as would have come to [their] knowledge in the proper discharge of that duty"); <u>Smith v. Miller</u>, 137 A. 254, 256 (Pa. 1927) ("One about to purchase land, either at sheriff's or private sale, is bound to inquire of those in possession of the premises and is charged with what such inquiry would have disclosed."); <u>Stonecipher v. Keane</u>, 112 A. 233, 234 (Pa. 1920)("A prospective purchaser of land is required to make inquiry of those in possession thereof, and failing to do so, is affected with constructive notice of all that such inquiry would have disclosed."); <u>Bugbee's Appeal</u>, 1 A. 273 (Pa. 1885) (same); <u>Rowe v. Ream</u>, 105 Pa. 543 (Pa. 1884) (same); <u>Hood v. Fahnestock</u>, 1845 WL 5137, at *4 (Pa. Sept. Term 1845) ("every purchaser of land must be presumed to know, whether the possession be vacant or not" and the purchaser of real property "in the possession of tenants is chargeable with notice of the extent of their interests as tenants" and must "inform himself of the conditions of the lease").

mortgagee.[61]  A purchaser or mortgagee who fails to make such inquiry concerning the basis of

the possessor's interest takes title <u>subject to</u> the possessor's interest.[62]

Does this general rule regarding a purchaser's duty of inquiry as to persons in physical

possession of real property apply in the circumstances of this case?  Answering this question

requires consideration of a potentially applicable exception to the rule.

### (1) The Debtor's Status As A Former Record Titleholder Does Not Discharge the Downstream Title Defendants' Duty of Inquiry

In certain circumstances, Pennsylvania courts have recognized an exception to a

subsequent purchaser's duty to inquire about a property occupant's rights <u>when the current</u>

<u>occupant was previously the record title owner of the property</u> (as the Debtor was here).[63]  <u>See,</u>

---

[61]        <u>See, e.g.</u>, <u>Sidle</u>, 29 A.2d at 82 ("[i]t is well settled that purchasers <u>and mortgagees </u>of real estate are affected not only by matters of which they had actual knowledge and by what appeared in the office of the recorder of deeds . . . but as well by what they could have learned by inquiry of the person in possession") (internal quotations omitted) (emphasis added).

[62]        <u>See, e.g.</u>, <u>Malamed</u>, 80 A.2d at 357-358; <u>Hunter v. Hunter</u>, 20 Pa. D. & C.3d 96, 100 (Cumberland Cty. C.P. Ct. 1981); <u>Crowell v. Bell</u>, 40 Pa. D. & C. 326 ( Montgomery Cty. C.P. Ct. 1940).

[63]        Not only were the Downstream Title Defendants on notice of the Debtor's occupancy of the Allengrove Property, but they also had reason to believe that she was a purported tenant.  Rauso told Maness that the Debtor was a tenant.  Additionally, the appraisal obtained by Countrywide and the reference to the Debtor's lease in the Buy-Back provision of the Trust Agreement put the Downstream Title Defendants on notice of the tenancy.

The Downstream Defendants' knowledge of the purported tenancy raises a question whether purported tenancy (as distinguished from the Debtor's mere occupancy) provided sufficient explanation for the Debtor's presence at the Allengrove Property, negating any further duty to inquire about the Debtor's interest in the property.  It does not.

(continued...)

67

e.g., Stiffler v. Retzlaff, 11 A. 876 (Pa. 1887); Scott v. Gallagher, 1826 WL 2271 (Pa. Jun. 28,

1826); Hunter, 20 Pa. D. & C.3d 96.  In application, this exception appears to be reserved for

cases in which a court is convinced that the former record titleholder (and current occupant of

the property):  (1) participated in some manner in misleading the subsequent purchaser about the

occupant's claim to title and (2) failed to act promptly to assert his or her ownership rights.

　　　　An early Pennsylvania Supreme Court case, Scott v. Gallagher, aptly illustrates this

exception.  Gallagher involved the transfer of a deed to 100 acres of land from Gallagher to

McCormick.  The purpose of the transfer was to enable McCormick to sell the land on

Gallagher's behalf.  Gallagher recorded the deed that granted title to McCormick and

McCormick executed a bond to Gallagher.  The condition of the bond was that:  (1)  McCormick

---

[63](...continued)
　　　　In Brinser v. Anderson, 18 A. 520, 521 (Pa. 1889) (emphasis added), the Pennsylvania
Supreme Court held that:

> Knowledge of the existence of a lease will, of course, give constructive
> notice of all of its provisions; but the possession, apart from the lease, we
> think, should be treated as notice of the possessor's claim of title, whatever
> that claim may be . . . .
>
> [T]he lease may have been the instrument of a base fraud.  It may have been
> executed under the false and fraudulent pretense, to an illiterate person, that
> it was in fact a conveyance or a contract of sale.  Would possession afford
> no protection in such a case?  We think it would.

　　　　The Pennsylvania Supreme Court's holding in Brinser continues to have vitality today.

　　　　Accordingly, the Downstream Title Defendants' knowledge that the Debtor was occupying the
Allengrove Property as a tenant does not, in itself, exempt them from the general rule that a purchaser of
an interest in real property must inquire directly of any occupant whether he or she claimed any
unrecorded interest in that property.

was to go to Philadelphia to try to sell Gallagher's land for a certain sum, (2) if McCormick sold

the land, he was to return the proceeds to Gallagher, and (3) if he could not sell the land by a

certain date and for a certain sum, McCormick was to return the deed to Gallagher.  1826 WL

2271, at *2.  The terms of this arrangement were <u>not</u> recorded.

   McCormick went to Philadelphia, but never sold the land.  Thereafter, neither he nor

Gallagher ever took any steps to have the property deeded back to Gallagher.  Consequently,

when McCormick died, the land was treated as part of McCormick's estate and his heirs

inherited it and sold it.  A number of subsequent sales of the property by persons claiming under

McCormick's chain of title followed.  All the while, Gallagher and his family maintained open,

physical possession of the land (<u>i.e.</u>, they cleared land on the property and built a house).  The

last buyer in the McCormick chain of title (Scott) brought the <u>Gallagher</u> case as an action to

recover possession of the land from Gallaghers.

   The Pennsylvania Supreme Court ultimately affirmed a judgment against the Gallaghers

and in favor of the buyer in the McCormick chain of title, finding that the buyer was a bona fide

purchaser, protected from the Gallaghers' claim to title.  In reaching this ruling, the court

rejected Gallagher's argument that the buyers failure to inquire about the Gallaghers' rights to

the property they occupied  precluded any finding that the subsequent buyer was a bona fide

purchaser.

   Important to the court's ruling was that Gallagher voluntarily participated in conduct that

had the effect of misleading subsequent purchasers about the nature of his claimed interest in the

land he deeded to McCormick – <u>i.e.</u>, Gallagher could have and should have recorded the terms of

his arrangement  with McCormick and the limitations on McCormick's title and "spread it upon the records of the county, in order to prevent innocent purchasers from being deceived." Id. at *2.  The court also was influenced by the fact that it did not "appear that Gallagher ever took any steps whatever to obtain a reconveyance of the land, or a surrender of the deeds placed in the hands of McCormick." Id. at *3:

> [Gallagher] rests merely upon his possession, without having given any notice whatever of the real nature of the transaction between him and McCormick, or making any application to the court for a rule on McCormick, to compel him to reconvey and redeliver a deed placed in his hands.

Id.

The later Pennsylvania cases apply this exception narrowly in circumstances involving equitable concerns similar to those present in Gallagher.  Generally, the cases all appear to involve a "secret agreement" between the former record titleholder, a "straw" titleholder and a failure by the current occupant/former record titleholder to act promptly or diligently to assert his or her claims to title to the prejudice of the subsequent purchaser.  See, e.g., Stiffler, 11 A. 876 (father deeded land to son, deed was recorded, then father and son privately agreed that certain portions of land in the deed should not pass, but father never arranged to  record a correction and the property was subsequently transferred to third party); Hunter, 20 Pa. D. & C.3d 96 (parents deeded property to son "for their own financial convenience," not intending son have beneficial interest, and son subsequently mortgaged property).

I acknowledge that the language employed in some of these cases is sometimes very broad.  For example, in Hunter, the court stated:

70

> A purchaser or encumbrancer from the grantor's grantee is not required to inquire of the grantor in possession whether such grantor reserved any interest in the land conveyed. The grantor's deed is held to be conclusive. In effect, by conveying such a deed, the grantor raises a presumption that he has made no reservation, that his continued possession is merely permissive and not antagonistic to his grant and that such continued possession is not a notice of other rights.

20 Pa. D. & C.3d at 100.

However, when viewed in context of the facts and circumstances presented in the cases, the quoted proposition applies only to narrowly circumscribed situations where there are equitable concerns at play due to the occupant's own conduct. For example, in the passage that immediately follows the portion of <u>Hunter</u> that is quoted above, the court noted:

> If there are any secret agreements or other secret rights not recorded on the deed, it is the possessor's duty to enter such agreements or rights upon the records of the county to prevent innocent purchasers from being deceived.

<u>Id.</u>

In other words, the line of cases discussed above does not establish the broad principle that, in all circumstances, a purchaser is entirely relieved from a duty of inquiry when a former owner is the current occupant of a property . Rather, the case law suggests only that the failure to make that inquiry may not vitiate bona fide purchaser status if the inadequate inquiry is outweighed by certain equitable circumstances.

Based on this reading of Pennsylvania case law, I conclude that the limited exception to a subsequent purchaser's/mortgagee's duty of inquiry does not apply to the facts and circumstances of this case.

To start, the Plaintiffs are not guilty of voluntarily participating in an effort to mislead

71

subsequent purchasers.  They had no "secret agreement" with Rauso.  True, the Trust Agreement

was not recorded.  But, it was not left unrecorded at the Plaintiffs' behest.  Further, and more

importantly, it was no "secret."  The Trust Agreement was referenced in the recorded Fowler-

Rauso Deed and its importance to Rauso's authority or ability to transfer title to any subsequent

purchaser was in plain view of the Downstream Title Defendants' title agent.  He required that

he be provided a copy of the agreement before insuring title.  He received and reviewed a copy

of the agreement.  Apparently, he either misinterpreted it or failed to grasp the import of the

information contained in it.  As a result, the Downstream Title Defendants are imputed with

notice regarding the terms of the Trust Agreement.

Furthermore, the Plaintiffs acted promptly and diligently in asserting their claimed rights

to the Allengrove Property.  On January 3, 2007, the Debtor's husband wrote a letter to Rauso,

and the Debtor called Rauso to cancel the transaction.  The Debtor also consulted with a friend

who was an attorney and acted on that attorney's advice.  The Debtor sent notice of her intent to

cancel the December 11th Transaction by certified mail on January 17, 2007.   Further, the

Debtor consulted additional attorneys at CLS.  Acting on CLS' advice, she sent a revocation of

the power of attorney she had granted Rauso.  She also consulted with counsel about further

means of undoing the Plaintiffs' transaction with Rauso, which resulted in the filing of this

bankruptcy case in March and the prompt commencement of this adversary proceeding.[64]

---

[64]    At trial, Rauso's counsel asked the title agent, DiGiacomo whether, in reviewing the title
search, he found any lis pendens regarding the Allengrove Property.  (See 1 N.T. at 98).  Counsel's line of
questioning implied an underlying argument that the Plaintiffs could have done more than they did to
cancel the December 11th Transaction and put third parties on notice of their rescission, i.e., that Plaintiffs

(continued...)

Consequently, I do not find that the circumstances of this case warrant application of this

limited exception to the long line of cases that impose a duty upon a purchaser or mortgagee to

inquire about a current occupant's claimed interests in real property where the occupant's

interests are not recorded.

### (2) Other Considerations

Furthermore, circumstances other than the Debtor's physical occupation of the

Allengrove Property, required further inquiry or investigation on the part of the Downstream

Title Defendants to justify according them BFP status.

---

[64](...continued)
could have filed a lis pendens and/or instituted litigation sooner.

     To the extent Rauso contends that the Plaintiffs could have filed a lis pendens without having first commenced litigation regarding the Allengrove Property, that contention is inconsistent with Pennsylvania law.  "Lis pendens literally means pending suit . . . ."  McCahill v. Roberts, 219 A.2d 306, 308 (Pa. 1966) (emphasis added).  "Lis pendens is construed to be the jurisdiction, power, or control

which courts acquire over property involved in a suit, pending the continuance of an action, and until final judgment."  Dorsch v. Jenkins, 365 A.2d 861, 863 (Pa. Super. Ct. 1976).

     To the extent Rauso contends that the Plaintiffs' equitable claim to ownership of the Allengrove Property should be cut off because they did not file suit sooner, I am unpersuaded.  Once the Plaintiffs announced their intentions to rescind, Rauso appears to have moved rapidly to sell the Allengrove Property.  By January 20, 2007, less than two (2) weeks after the Plaintiffs acted to rescind, Rauso had already signed an Agreement of Sale with Borso and Maness and he never informed the Plaintiffs of his intentions and efforts to market the Allengrove Property.  Consequently, the Plaintiffs had no reason to believe that they had to engage in a race with Rauso and provide immediate notice to the world of their ownership claim.  Further, as discussed above, the Debtor promptly consulted with no less than three (3) attorneys and followed the advice of those attorneys, leading up to the commencement of this adversary proceeding within approximately three (3) months after the Plaintiffs exercised their UTPCPL rescission rights.  In the interim, the Debtor's open and exclusive possession of the Allengrove Property acted to put any potential purchasers or mortgagees on notice of the equitable claim to ownership.

The Downstream Title Defendants were on notice that Rauso's authority to transfer title was highly "contract-dependent."  Rauso obtained both his title and his authority to transfer title subject to the terms of the Trust Agreement.  The Trust Agreement conditioned his authority to sell on the agreement of the Beneficiary (defined to mean the Plaintiffs).  It also contained a 30-day right to terminate and a Buy Back Clause.  The Buy Back Clause, in turn, guaranteed the Plaintiffs the first right to re-purchase the property, with that Clause being conditioned on the Plaintiffs' adherence to the terms of the lease.

Notwithstanding this knowledge and these contingencies, there was no evidence at trial that either the Downstream Title Defendants nor their title agent made any inquiry of the Plaintiffs concerning whether, inter alia:

(1)   the Plaintiffs had terminated (or believed that they had terminated) the Trust Agreement and were continuing in possession of the Allengrove Property pursuant to their claim that they had validly terminated it;

(2)   the Plaintiffs had complied (or believed that they had complied) with the lease; and

(3)   whether, pursuant to the Buy Back Clause, Rauso had offered the Plaintiffs the opportunity to re-purchase the Allengrove Property before offering to sell the property to Borso and Maness (or whether the Plaintiffs believed Rauso breached that duty).

Yet, the answer to any one of these questions easily could affect Rauso's authority to transfer title.

Furthermore, the record suggests that the Downstream Title Defendants recognized that at least certain of these contract terms had the potential to completely change the complexion of Rauso's prospective sale of the Allengrove Property to Borso and Maness.  For example, Maness

74

testified that, had he known that the person who was living at the Allengrove Property had

attempted to rescind her transaction with Rauso, he would have walked away from the purchase.

(See 1 N.T. at 246).  Additionally, with the respect to the existence of a "buy back" right, the

title agent testified that if he had known that someone had an enforceable right to buy back the

Allengrove Property, he would need to pursue additional steps (e.g., discussing it with the parties

and underwriting, etc.) before determining whether a title insurance policy could be issued.  (1

N.T. at 96-97).  Surely, ascertaining whether anyone had such right falls within the scope of the

required duty to exercise reasonable diligence in purchasing real property.


### d. The Downstream Title Defendants Are Not Bona Fide Purchasers

For the reasons set forth above, I find that in the "exercise of ordinary diligence," see

Lauver, 372 B.R. at 760,  the Downstream Title Defendants had a duty to ask the Debtor whether

she claimed any rights to the Allengrove Property.  Not having discharged that duty, they are

charged with notice of facts that they would have learned in the proper discharge of that duty.

See, e.g., Malamed, 80 A.2d at 855.

Had they spoken to the Debtor, the Downstream Title Defendants would have learned

that the Plaintiffs had repeatedly notified Rauso of their intent to terminate the Trust Agreement

and that the Debtor was occupying the Allengrove Property pursuant to a claim of ownership.

Imputed notice of these facts is fatal to the Downstream Title Defendants' BFP Defense.

See Stonecipher, 112 A. at 234.  Essentially, the Downstream Defendants took title subject to the

Plaintiffs' claim that the Fowler Trust's title to the property was voidable and, as it turns out,that

claim is meritorious.

Accordingly, by virtue of their §201-7 claim, the Plaintiffs are entitled to regain title to

the Allengrove Property and to have Borso's and Maness' title and Countrywide's mortgage lien

set aside.

### 2.    Countrywide Is Entitled to An Equitable Lien

As a fallback to its bona fide purchaser defense, and in the event that the court held that

the Plaintiffs are entitled to restoration of their title to the Allengrove Property, Countrywide

requested that the court impose an "equitable mortgage" or "equitable lien" in its favor, either:

> (1) in the full amount of its previous mortgage on the Allengrove Property, or

> (2) alternatively, in an amount equal to the proceeds of its mortgage that were used to
> pay off the GMAC Mortgage and other liens that encumbered the Allengrove
> Property on the date of the February 15, 2007 closing.

(See Countrywide Trial Brief, Adv. Docket No. 67).

Countrywide argues that, absent such a remedy, the Plaintiffs would receive an

unintended and inequitable windfall, i.e., the Plaintiffs would regain title to the Allengrove

Property without any mortgages, liens or judgments encumbering property due to Countrywide's

payment of these debts and expenses.[65]

---

[65]     The Plaintiffs challenge Countrywide's right to request any affirmative relief on the
ground that Countrywide did not assert a counterclaim against the Plaintiffs in this adversary.  I reject this
threshold defense.

It is a well-settled doctrine of equity that he who seeks equity must do equity.  Stanko v.
Males, 135 A.2d 392, 395 (Pa. 1957).  Where, as here, the Plaintiffs seek the remedy of rescission, part

(continued...)

76

As explained below, I agree with Countrywide.

### a.   the court's power to impose an equitable lien under Pennsylvania law

"A court, exercising its equitable powers, may impose an equitable mortgage or lien on a property under the proper circumstances." <u>Phillips v. Resolution Trust Corp.</u>, 1995 WL 230993, at *2 (E.D. Pa. Apr. 19, 1995).  In <u>Phillips</u>, the court explained the difference between the doctrines:

> [A] court creates an equitable mortgage to give an effect to an intention of the parties to create a mortgage, typically where a defect in an instrument renders an intended mortgage invalid; it creates an equitable lien regardless of the intent of the parties, as a remedial device to protect a party against inequitable loss and to prevent unjust enrichment.

<u>Id</u>. at *2; <u>see</u> <u>also</u> <u>First Fed. Sav. & Loan Ass'n v. Reedy</u>, 35 Pa. D. & C.2d 299 (Luzerne Cty. C.P. Ct. 1964) ("an equitable lien is recognized where improvements have been made to one person's property with another person's money or property so as to amount to unjust enrichment").

---

[65](...continued)
and parcel of the award of that remedy is returning the parties, to the extent possible, to the status <u>quo ante</u>.  <u>See</u> <u>Baker v. Cambridge Chase, Inc.</u>, 725 A.2d 757, 766 (Pa. Super. Ct. 1999) ("It is well known that the purpose of equitable rescission is to return the parties as nearly as possible to their original positions where warranted by the circumstances of the transaction.").  Accordingly, Countrywide is

entitled to request the imposition of an equitable remedy notwithstanding its failure to include such a claim in its filed Answer.  <u>See also</u> Fed. R. Civ. P. 15(b)(2) (if actually tried by express or implied consent, court may treat issues not raised by the pleadings as if raised in the pleadings) (incorporated in this adversary proceeding by Fed. R. Bankr. P. 7015); Fed. R. Civ. P. 54(c) ("[e]very . . .  final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings") (incorporated in this adversary proceeding by Fed. R. Bankr. P. 7054).

In this proceeding, because the relief Countrywide seeks is premised on preventing the

unjust enrichment of the Plaintiffs, the proper terminology for the form the remedy it seeks is an

"equitable lien."

In recognizing the judicial power under Pennsylvania law to impose equitable liens, the

Pennsylvania Supreme Court has cited with approval section 161 of the Restatement (First) of

Restitution.  See Gladowski v. Felczak, 31 A.2d 718, 720 (Pa. 1943); Gen. Casmir Pulaski Bldg.

& Loan Ass'n v. Provident Trust Co. of Philadelphia, 12 A.2d 336, 338 (Pa. 1940).  Section 161

states:

> Where property of one person can by a proceeding in equity be reached by
> another as security for a claim on the ground that otherwise the former would
> be unjustly enriched, an equitable lien arises.

Restatement (First) of Restitution §161 (1937) ("Restatement").

The question here is whether the Pennsylvania Supreme Court would impose a equitable

lien under the facts presented in this case.

My research has not uncovered a case decided under Pennsylvania law regarding a

mortgagee's entitlement to an equitable lien that is on all fours with the circumstances presented

in this case (i.e., where (1) a mortgagee financed the acquisition of real property pursuant to a

mistaken, good faith  belief that the purchaser was acquiring clear title to the property; (2) the true

property owner played no role in creating and had no prior knowledge concerning the mistake of

fact; (3) unbeknownst to the true owner, the loan proceeds were used, in part, to pay off existing

liens on the property and obligations of the true owner; and (4) the mortgagee's lien is voided

78

solely due to the imputation of constructive notice regarding the true owner's property rights).[66]

The absence of such precedent, however, does not detract from the court's power to do equity.

See Farmers Nat'l Bank of Bloomsburg v. Albertson, 199 A.2d 486, 489 (Pa. Super. Ct. 1964)

("On questions of this nature no two cases are alike.  Each case rests upon its own peculiar facts

and the general equitable principles relative thereto").


### b.  legal standards for imposition of equitable lien in Pennsylvania

The cases Countrywide has cited in support of its request for equitable relief  all involve a

variant of the "good faith improver doctrine"  –  i.e., the concept that "when a bona fide possessor

---

[66]     There is a line of cases in Pennsylvania in which mortgagees were denied equitable liens

where the underlying mortgage documents were forged or otherwise were executed without the authority
of the record owner.  As one court described the result in these cases, "in the situation where the mortgage
is void because it has been executed without the knowledge or consent of the mortgagor, Pennsylvania
adopts the minority view declaring that the mortgagee is a volunteer and is not entitled to [an equitable
remedy]." First Fed. Savings & Loan Ass'n v. Reedy, 35 Pa. D. & C.2d 299, 304 (Luzerne Cty. C.P. Ct.
1964) (emphasis added) (citing Campbell v. Foster Home Ass'n, 30 A. 222 (Pa. 1894)); see also Phillips
v. Resolution Trust Co., 1995 WL 230993 (E.D. Pa. Apr. 19, 1995); Williard v. Millersburg Trust Co., 48
Pa. D. & C.2d 149, 153-56 (Dauphin Cty. C.P. Ct. 1969).

As the emphasized language suggests, however, this line of authority applies only to instances in
which a mortgagee obtains a void mortgage and is not dispositive here where the mortgagee's title was
merely voidable.  As the Reedy court observed:

> [I]n those cases involving a failure of title on the part of the mortgagors, most
> jurisdictions allow subrogation to be decreed.  Pennsylvania is in accord, as
> indicated in Gladowski v. Felczak, supra. However, in the situation where the
> mortgage is void because it has been executed without the knowledge or consent
> of the mortgagor, Pennsylvania adopts the minority view [as indicated in
> Campbell v. Foster Home Ass'n] declaring that the mortgagee is a volunteer and
> not entitled to subrogation

Reedy, 35 Pa. D. & C.2d at 303-04.

of property makes improvements upon [real property], in good faith and under an honest belief of

ownership, and the real owner for any reason seeks equitable relief, the court, applying the

familiar principle that he who seeks equity must do equity, will compel him to pay for the

improvements to the extent that they have enhanced the value of the land." Stanko v. Males, 135

A.2d 392, 395 (Pa. 1957); see Nebesho v. Brown, 846 A.2d 721, 725 (Pa. Super. Ct. 2004). The

"improvements" in this instance would be the enhancements to the value of the Plaintiffs' real

property caused by Countrywide's payment of outstanding liens and judgments from the proceeds

of its loan to Borso and Maness.

The doctrine of unjust enrichment in connection with the satisfaction of liens on real

property is described in §43 of the Restatement, titled "Performance of Another's Duty or

Discharge of Lien Against His Property." Section 43, which was cited and applied by the

Pennsylvania Supreme Court in Gladowski v. Felczak, 31 A.2d at 720, states the equitable rule

this way:

> Where a person lends money to another who contracts to use the money for the
> discharge of a lien upon property which the other represents as belonging to him
> and where the money so lent is used for the discharge of the lien, the lender is
> entitled to have the lien reinstated for his benefit if, unknown to him, the property
> was not owned by other or was subject to a junior lien.

Restatement §43.

The primary difficulty in applying §43 of the Restatement to the facts in this case stems

from the phrase "unknown to him." Certainly, §43 suggests that granting equitable relief is

contingent upon the lender or mortgagee's lack of knowledge regarding the property rights of the

"other" (here, the "other" being the Plaintiffs). If equitable liens could be obtained only by

80

parties who conferred improvements on the real property of others based on a mistaken belief as

the property's true owner <u>and</u> who also met the definition of a bona fide purchaser for value,

Countrywide would not be entitled to such a lien.  Countrywide does not qualify as bona fide

purchaser due to its assignor's "constructive notice" of the Plaintiffs' rights to the Allengrove

Property.

The question, then, is whether the Pennsylvania Supreme Court would deny Countrywide

equitable relief under the circumstances of this case because of its assignor's constructive

knowledge (knowledge that is imputed by law as something that "should have been known," even

though not actually known) of the Plaintiffs' property rights.  After careful consideration of the

relevant cases and authority, I am convinced that the Pennsylvania Supreme Court would <u>not</u> find

that constructive notice automatically defeats the right to equitable relief.

<u>Gladowski v. Felczak</u> is seminal in providing guidance and in defining the circumstances

pursuant to which equitable relief may be provided to a lender whose mortgage lien has been

voided through a failure of title.  In <u>Gladowski</u>, the American Citizens Club ("the Club") acquired

property from the Polish Falcons of America ("the Falcons").  The deed was recorded.

Subsequently, the Club obtained a mortgage loan from the Gladowskis to repair the property, pay

off a judgment lien and pay past due real estate taxes.  <u>Id.</u> at 719.  Through separate litigation, and

after the mortgage was made, the conveyance to the Club was judicially determined to be invalid

due to the Falcon's failure to follow procedures set forth in the constitution of their national

organization.  Because the deed was invalid, the mortgage was "necessarily also invalid."  <u>Id.</u>

The Gladowskis commenced litigation seeking to have the amount of the invalid mortgage

declared a lien on the property.  The Pennsylvania Supreme Court determined that the

Gladowskis were entitled to an equitable lien, noting:

> The crucial fact is that the mortgage money was used wholly for the benefit
> of the property which has now been restored to the ownership and possession
> of the [owner].  As already stated, when the latter conveyed the property to the
> Club the building, due to the ravages of the flood, was totally unfit for occupancy,
> and it was saddled with a judgment lien which the [owner] had no means to satisfy.
> If the [owner] were to be allowed, without any equitable obligation on its part, to
> hold the property freed of that judgment and with it clubhouse restored by the
> repairs made upon it, and plaintiffs were to be denied the right to recover the
> money loaned by them in good faith and used, in the manner indicated, for the
> ultimate benefit of the [owner], every proper conception of morals and fair
> dealing would be violated.
>
> * * *
>
> Plaintiffs' right to equitable relief is dependent upon their innocence in making
> the mortgage loan, but there is nothing in the record which militates against the
> presumption that they acted without knowledge of the invalidity of the Club's
> title. [T]he most that can be said is that [Gladowski] made the loan and accepted
> the mortgage through a mistake of fact.

Id. at 663-665 (emphasis added).

The Gladowski court emphasized the need to examine the equities and the innocence or

good faith of the lender in reaching a determination whether to award an equitable lien.  In

Gladowski, the decisive considerations were that the owner had received a large windfall and

benefitted from improvements that rendered previously uninhabitable property habitable due to

the mortgage proceeds.  These same factors are echoed as considerations in other Pennsylvania

jurisprudence.  See, e.g., Stanko, 135 A.2d at 395 (where wife forged husband's signature on deed

conveying land formerly held by entireties and transferred deed to third parties who paid

mortgage, third parties were entitled to equitable relief because of their "innocence" in paying

money and "good faith and under an honest belief in ownership") (emphasis added).

Thus, to the extent that Pennsylvania law conditions the right to equitable relief upon a showing of the lack of knowledge and  "innocence" of the  improver/mortgagee, and in the absence of any relevant authority addressing the effects of constructive notice on the entitlement to equitable relief, I predict that the Pennsylvania Supreme Court would construe this reference to "innocence" or like concepts to protect not only bona fide purchasers/mortgagees, but also parties who have acted in "good faith" and "without actual notice" of other claims of property ownership. To rule that imputed, constructive notice also renders a good faith mortgagee ineligible for equitable relief, could serve merely to confer an unintended and unjust windfall on the Plaintiffs and an undeserved punishment on the mortgagee.  See generally Restatement §59 ("A person who has conferred a benefit upon another by a mistake is not precluded from maintaining an action for restitution by the fact that the mistake was due to his lack of care.").

In a nutshell, like the court in Williard v. Millersburg Trust Co., I conclude that the outcomes in those Pennsylvania cases denying equitable liens to "mere volunteers," are not based on a strict application of the requirements necessary to achieve bona fide purchaser status, but rather to a fact-intensive "balancing of the equities."  48 Pa. D. & C.2d at 157.[67]  This balancing analysis includes, inter alia, a consideration of the relative culpability and innocence of the parties.  See generally Park v. Greater Delaware Valley Sav. & Loan Ass'n, 523 A.2d 771, 775 (Pa. Super. Ct. 1987).

_____

[67]     Williard is a Pennsylvania trial court decision.  I note, however, that its author, Judge Bowman, later served as the first Chief Judge of the Pennsylvania Commonwealth Court.

83

### c.  balancing the equities in this case

In this case, I have determined that Countrywide is not entitled to protection as a bona fide purchaser because its assignor, the original lender that financed the Borso/Maness acquisition of the Allengrove Property and took a mortgage on the property (Money Warehouse), was on constructive notice of the Plaintiffs' equitable claim to ownership.  Nonetheless, after considering the circumstances presented here and balancing the equities, I find it appropriate to impose an equitable lien against the Allengrove Property in Countrywide's favor.

While certain aspects of the Allengrove Property acquisition and the Debtor's physical possession of the Allengrove Property were such that Countrywide's assignor was placed on constructive notice of the Plaintiffs' equitable claims, I do not find that the assignor had actual notice of the Plaintiffs' claims.  Nor do I find any evidence that Countrywide's assignor entered into the mortgage loan transaction with Borso and Maness (resulting in the pay off of existing liens against both the Allengrove Property) in bad faith or with an intent to harm the Plaintiffs. At most, its title agent performed an inadequate review of the transactional and title documents. Thus, for purposes of §43 of the Restatement, I consider the assignor (and Countrywide in succeeding to the assignor's position) to have acted in good faith.

In balancing the equities, I also must consider the Plaintiffs' position.  Certainly, the Plaintiffs were also innocent in the sense that they were victimized by Rauso's failure to comply with his statutory obligations under the UTPCPL.  However, before Countrywide's assignee paid the GMAC Mortgage, GMAC had obtained a default judgment and the Allengrove Property apparently was moving briskly towards a sheriff's sale.  The Plaintiffs were on the verge of losing

the Property altogether.  By virtue of Countrywide's assignor's payment of the Plaintiffs'

mortgage, the Plaintiffs avoided imminent foreclosure and the Debtor has been living in the

Property for the past two (2) years rent free (while her husband has been incarcerated) and have

made no mortgage payments.

By virtue of my rulings that Borso, Maness and Countrywide are not bona fide

purchasers/mortgagees and that the Plaintiffs are entitled to an order setting aside the property

interests of those defendants, the law has already adjusted the property rights of the interested

parties to the Plaintiffs' benefit.  If the Plaintiffs were to be allowed, without any equitable

obligation on their part, to take back the Allengrove Property free of the GMAC mortgage, and

other liens satisfied by Countrywide's assignor and Countrywide's mortgage, the Plaintiffs would

obtain a significant, unintended windfall that I conclude would be unjust.[68]

Further, permitting the Plaintiffs to regain ownership of the Allengrove Property free and

clear of all liens would be inconsistent with the general purpose of the statutory right of

rescission, which is to restore, insofar as possible, the status quo ante.  See generally Gilmore v.

Northeast Dodge Co., Inc., 420 A.2d 504, 507 (Pa. Super. Ct. 1980) (involving equitable

rescission); Parker v. Long Beach Mortg. Co., 534 F. Supp. 2d 528, 537 n.9 (E.D. Pa. 2008)

(involving statutory rescission under the federal Truth in Lending Act); Mayfield v. Vanguard

---

[68]        Another consideration in balancing the equities is the relative abilities of the parties to
protect themselves from the misconduct that occurred in the series of transactions (perpetuated by Rauso).
While I recognize that Countrywide's assignor (and Countrywide) were in a better position than the
Plaintiffs to protect themselves from Rauso's misconduct and, in fact, did so by purchasing title
insurance, I find this factor outweighed by the unfairness of the potential windfall that the Plaintiffs
would receive if no equitable lien were imposed in Countrywide's favor.

Sav. & Loan Ass'n, 710 F. Supp. 146, 147 (E.D. Pa. 1989) (same); Valentine v. Influential Sav.

& Loan Ass'n, 572 F. Supp. 36, 40 (E.D. Pa. 1983) (same).

For these reasons, I construe Pennsylvania law to permit Countrywide to obtain equitable

relief even though its assignor had constructive notice of the Plaintiffs' equitable ownership

interests in the Allengrove Property, and that the imposition of an equitable lien in this case is

appropriate.

### d.   the extent of the Countrywide's equitable lien

As discussed above, I am convinced that Countrywide is entitled to have an equitable lien

imposed on the Allengrove Property.  However, that lien shall be imposed, not for the entire

amount of the current Countrywide Mortgage, but in an amount equal to the expenditures that

were made that benefitted the Allengrove Property and/or enhanced its value.  See, e.g., Nebesho,

846 A.2d at 729.

Very little evidence was introduced at trial to provide an explanation of the basis and

reasons for the disbursements made with the proceeds of the mortgage loan that Countrwide's

assignor granted to Borso and Maness.  However, it is clear from the nature of certain of the

expenditures (and from the additional information I can deduce from my review of the HUD-1

(Ex. CW-3)) and the title insurance work-up that led to the creation of the HUD-1 (Ex. CW-4)

that the part of the mortgage loan proceeds provided benefit to the Plaintiffs' and/or enhanced the

value of the Allengrove Property.  Those expenditures include:

1. $151,832.68 paid to GMAC to satisfy its mortgage on the Allengrove Property (<u>see</u> Ex. CW-3, at 1);

2. $732.59 paid to the City of Philadelphia on Judgment No. 0607721085, entered against Mr. Fowler (<u>see</u> Ex. CW-3 & Ex. CW-4 at page 5) ;

3. $5,829.00 paid to the City of Philadelphia on Judgment No. 0510730179, entered against Mr. Fowler (<u>see</u> Ex. CW-3 & Ex. CW-4 at page 5);

4. $17,776.49 paid to Commercial Credit Plan CDC to satisfy Judgment No. 050202334, entered against the Plaintiffs (<u>see</u> Ex. CW-3 & Ex. CW-4, at page 5);

5. $814.13 paid to the City of Philadelphia on a municipal lien in for gas service provided to the Allengrove Property (<u>see</u> Ex. CW-3 & Ex. CW-4, at page 5);

6. $373.59 paid to the Philadelphia Water Revenue Department on a water and sewer bill   (<u>see</u> Ex. CW-3); and

7. $100.00 paid to the Philadelphia Gas Works on a bill for gas service (<u>see</u> Ex. CW-3).

The record is devoid of evidence that permits me to find that any of the remaining expenses or disbursements on the HUD-1 should be included within the scope of Countrywide's equitable lien.[69]  The Plaintiffs are <u>not</u> responsible, under notions of unjust enrichment, for appraisal, tax service, processing, underwriting, flood certification, closing, document preparation, notary or other fees associated with the mortgage granted to Countrywide's assignor. Additionally, title or hazard insurance that named as beneficiaries parties other than Plaintiffs are not reimbursable by Plaintiffs.

The $203.42 payment made on Rauso's behalf with respect to Judgment No. 070102703

---

[69]      For example, no evidence was introduced to explain the disbursement entry for a "2007 Tax" paid to the "Dept. of Revenue."  Assuming, however, that this entry relates to a transfer tax, that tax is not properly borne by the Plaintiffs.

that was entered against him is also properly excluded from the amount of Countrywide's

equitable lien.  No evidence was introduced to suggest that this judgment benefitted the Plaintiffs.

Indeed, the Philadelphia County dockets suggest this was related to the Stephanie Lawson Trust.

See Commonwealth of Pa. v. Rauso, Philadelphia Cty. C.P. Docket No. 070102703.

Additionally, the $45,000.00 paid to D&B with respect to the mortgage Rauso recorded as

a means of gaining extra compensation for himself with respect to the December 11th Transaction

is also excluded.

Accordingly, I find that Countrywide is entitled to an equitable lien of $177,458.48.[70]

Additional issues remain to be resolved with respect to the details of Countrywide's

equitable lien.  These issues include:

- what interest rate should apply to this lien and when should that interest begin to apply?

- what terms should apply to the payment of this lien?

Because I do not believe the parties had an opportunity fully to consider, research and

discuss these issues, I will defer a decision on them at this time.  Instead, I will schedule a status

hearing to permit the parties to advise the court regarding their respective positions.  If the parties

cannot reach agreement on payment terms for the equitable lien, I will devise an appropriate

process for resolving any remaining issues and then set the terms.


### 3.  Actual Damages, Treble Damages, Attorney's Fees and Costs

---

[70]      I note that no issues are before the court regarding the effect, if any, this decision has on
the rights and obligations of Borso and Maness and Countrywide inter sese.

88

As an alternative to the remedy of regaining title to the Allengrove Property, the Plaintiffs requested actual and treble damages pursuant to 73 Pa. Stat. Ann. §201-9.2(a).

The Plaintiffs concede, as a general proposition, however, that an award of rescission precludes an award of actual damages.  (See Plaintiffs' Post-Trial Mem. at 9); see also In re Steinbrecher, 110 B.R. 155, 159 (Bankr. E.D. Pa. 1990) ("As a general principle, the rescission of an agreement precludes an award of actual damages"); Wedgwood Diner, Inc. v. Good, 534 A.2d 537, 539 (Pa. Super. Ct. 1987) (party cannot obtain both rescission and restitution).  Having succeeded in restoring title to the Allengrove Property in their names, invalidating the transfers of title to the Downstream Title Defendants (subject to the equitable lien in favor of Countrywide), the Plaintiffs have been restored, as closely as possible, to the position they occupied before the December 11th Transaction and would appear to have suffered no actual, monetary harm.  Accordingly, no "actual damages" shall be awarded or trebled.

With respect to the Plaintiffs' request for an award of attorneys' fees and costs, the Plaintiffs having succeeded in establishing a violation of the UTPCPL, I find that the Plaintiffs are entitled to an award of attorney's fees and costs for filing and prosecuting this adversary proceeding.  I will therefore, allow Plaintiffs' counsel to file a motion for award of counsel fees and costs, to be awarded against Rauso.[71]

## V.  CONCLUSION

---

[71]    Only Rauso is responsible for the Plaintiffs' counsel fees and costs under the UTPCPL as I have not determined that any of the other Defendants violated the statute.

In sum, for the reasons set forth above, I have determined that:

1. 73 Pa. Stat. Ann. §201-7 applies to the Plaintiffs' December 11th Transaction with Rauso.

2. Rauso violated §201-7.

3. The Plaintiffs' are entitled to rescind the December 11th Transaction with Rauso.

4. The Plaintiffs are entitled to regain title to the Allengrove Property.

5. Borso, Maness and Countrywide are not bona fide purchasers/mortgagees for value. Accordingly, these parties took title in the Allengrove Property subject to the Plaintiffs' equitable rights.

6. The Plaintiffs are entitled to the restoration of their title to the Allengrove Property

   free and clear of Borso's and Maness' title and Countrywide's mortgage.

7. Countrywide nevertheless is entitled to an equitable lien on the Allengrove Property in the amount of $177,458.48. The repayment terms of the equitable lien will be the subject of further proceedings.

8. Having recovered title to the Allengrove Property, the Plaintiffs are not entitled to recover actual or treble damages from Rauso, but are entitled to recover attorneys' fees and costs from him.

9. Judgment shall be entered against Rauso, Borso, Maness, D&B and Countrywide and in favor of the Plaintiffs on Count I of the Complaint; and

10. Judgment shall be entered against the Plaintiffs and in favor of Borso, Maness, D&B and Countrywide on the remaining counts of the Plaintiffs' Complaint.

An order consistent with these conclusions will be entered.

**Date:  March 3, 2010**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**